TERRITORY OF HAWAII, BY C. T. BAILEY, COMMISSIONER OF PUBLIC LANDS, *v.* FRANCIS GAY, ET AL.

No. 1921.

ARGUED MARCH 6, 1930.  DECIDED APRIL 28, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF PERRY, C. J.

This is a suit in equity instituted by the Territory of Hawaii for the purpose of restraining a diversion by the respondents of certain waters from the valley of Koula by means of dams, ditches and pipelines to the arid lands of Makaweli, on the Island of Kauai. The Territory as owner or as representative of the United States of America is in control of the ahupuaa of Hanapepe whose boundaries were settled and determined by a commissioner of boundaries for that island. Within the outer boundaries of this ahupuaa are two valleys, called respectively Koula and Manuahi, and a third land called Kano. Koula and Manuahi are the property of the respondents Aubrey Robinson and Alice Robinson and Kano is the property of Aubrey Robinson. All three lands are under the control of the respondents who compose the partnership of Gay & Robinson (the respondent Francis Gay has died since the commencement of this suit). The respondent, the Hawaiian Sugar Company, Limited, is the lessee under Gay & Robinson of certain lands at Makaweli used for the purposes of a sugar cane plantation and of certain water rights, and as such lessee has participated in the diversion complained of.

The trial judge held that the respondents Gay & Robin-

son are the owners of the waters which are being diverted and entered a decree dismissing the bill. From that decree the case comes by appeal to this court.

The Island of Kauai is composed of a central mountain mass called Waialeale, with valleys or gulches radiating in all directions and reaching to the sea. On the summit of this central dome, 5240 feet in height at its highest point, is a large area of swampy land called the Alakahi swamp. The rainfall of Waialeale was thought until quite recently to be the heaviest on this earth, but another place, in India, has now been found with a heavier rainfall. However, from four hundred to five hundred inches of rain per annum fall on the Alakahi swamp. Reaching up into this central dome and swamp are the two lands of Koula and Manuahi, both of which share in the very heavy rainfall just referred to. Together these two lands form the whole of the mauka or upper part of the ahupuaa of Hanapepe. Their streams, if unrestrained by man, would flow through the valley and ahupuaa of Hanapepe to the ocean and, as it is, all of their waters in so far as undiverted by the respondents flow through the valley of Hanapepe to the sea except as used, in comparatively small quantities, upon kuleanas and other lower lands entitled thereto in Hanapepe. The land of Kano likewise contributes some waters to the Hanapepe stream, but only in very slight quantities,—in "negligible" quantities, one of the witnesses said.

The land of Koula has an area of 5520 acres. Judging from a map in evidence, the area of the land of Manuahi is about one-half of that of Koula, and the area of Kano would seem to be about one-fourth of that of Manuahi. These three lands together comprise by far the greater part of the ahupuaa of Hanapepe.

In *Territory* v. *Gay,* 26 Haw. 382, in which the parties were the same as those in the case at bar, it was found and

declared by this court that Koula was an ili and that though situated within the ahupuaa of Hanapepe it was never a part of that ahupuaa. At the trial in the case at bar it was expressly stipulated by the parties and admitted by the Territory that the lands of Manuahi and Koula "are independent ilis, otherwise known as ilis kupono" and that anciently each had "its separate konohiki." At the argument in this court, however, it was claimed on behalf of the Territory that an "ili kupono" is "of a lesser degree" in dignity than an ahupuaa. Counsel who advanced this claim admitted that that characterization of an ili was not to be found in the books and cited in support of it a statement by the late Mr. C. J. Lyons, an official of the survey department of the government of Hawaii, that "except in rare cases the ilis owed some small tribute (the traditional peppercorn) to the ahupuaa." The late W. D. Alexander, head of the survey department and the superior in office of Mr. Lyons, said in his "Brief History of Land Titles" that the ili kupono "generally did not pay tribute to its chief" and the late Sanford B. Dole, who held the offices of governor of Hawaii and of associate justice of the supreme court, in his report as governor in 1901 said: "Notwithstanding the allotment of the ahupuaa to the chief, the sovereign retained the right to carve out an ili ku" (an abbreviated form of expression for ili kupono) "which paid no tribute to the chief, but made its returns to the sovereign direct." More important still, the late Chief Justice Judd, who occupied that position for eighteen years, speaking fifty-three years ago (March, 1877,) in the case of *Harris* v. *Carter,* 6 Haw. 195, 206, 207, said: "I think that erroneous opinions have sometimes prevailed as to what are 'ahupuaas' and 'ilis.' An ahupuaa has been called the 'unit' of land in this country; but it is by no means a measure of area, for ahupuaas vary exceedingly as to size. Many

ahupuaas are divided into ilis; other ahupuaas have no ilis in them, as for instance, Kualoa and Waimanalo on this island. There are two kinds of ilis. One, the ili of the ahupuaa, a mere subdivision of the ahupuaa for the convenience of the chief holding the ahupuaa, as for instance, the ilis of Lihue and Waimanalo, in the ahupuaa of Honouliuli. The konohikis of such iliainas as these brought their revenues to the chief holding the ahupuaa. The other class were the 'ili kupono' (shortened into 'ili ku'). These were independent of the ahupuaa, nor did they pay general tribute to it. In some cases these iliainas are very numerous, absorbing the larger part of the ahupuaas. A well-known case is the ahupuaa of 'Waimea,' Hawaii, of which the ilis of 'Waikoloa' and 'Puukapu' form about nine-tenths. * * * The ilis in question in this suit are not distinctly named 'ili kuponos,' this name not being preserved in the mahele; but all the ilis that were recognized and treated in the mahele and awarded by the commission were undoubtedly 'ili kuponos.' This name was dropped, for, when separated from the ahupuaa by mahele and subsequent award, its necessity was gone. All other ilis went with the ahupuaa in which they were situated, and were not further distinguished. The inquiry just gone into is pertinent to the case before us, as showing that the 'iliaina' was a well-known division of land with its own identity, and I cannot see how the mahele or the award of the ahupuaa of Kailua carried with it an ili having its own distinct identity—unless clearly expressed or manifestly intended, and it is not so expressed, for the mahele calls for the 'ahupuaa' only."

Without some further and distinct authority than that cited by the appellant, we would not be justified in disturbing the long accepted view that an ili kupono, in the system of land tenures prevailing prior to the great mahele of 1845, was wholly independent of the ahupuaa with-

in whose outer boundaries it was situated and that it owed no tribute to the konohiki of the ahupuaa and that its konohiki was subservient directly to the king. The statement by Chief Justice Judd admits of no exception or qualification as to the independence of the ili kupono. The express stipulation of the Territory at the trial that Koula and Manuahi were ilis kupono, coinciding with and reinforced by the finding and ruling of this court in *Territory* v. *Gay,* 26 Haw. 382, 388, an ejectment case in which the title to Koula was in issue, carries with it the view and the conclusion that prior to the mahele those two lands were wholly independent of the ahupuaa.

The consideration of this point becomes necessary because of the two alternative claims of the Territory in asserting title to the waters which are being diverted by the respondents. Those claims are, first, that the ilis of Koula and Manuahi were "of lesser degree" and inferior to and a part of the ahupuaa of Hanapepe and that, therefore, the Territory, as the owner of the ahupuaa, was the owner of all of the surplus waters of the Hanapepe stream; and, second, that if it should be held that the ilis of Koula and Manuahi were not of less degree and dignity than the ahupuaa of Hanapepe they were at least not superior in degree or kind to the ahupuaa of Hanapepe or to any other ahupuaa and that, therefore, under the ruling in *Carter* v. *Territory,* 24 Haw. 47, 70, 71, the surplus waters should be apportioned between the ilis on the one hand and the ahupuaa on the other "in just proportions in accordance with existing circumstances" and that, the only relevant circumstances being that there are no arable lands in the two ilis above which have not primary water rights of their own or which need irrigation and that there are nineteen hundred acres of arid arable lands in the ahupuaa of Hanapepe requiring water and capable of fruitful production with the aid of water, the same

result would be reached, to-wit, that the ahupuaa would be entitled to all of the surplus waters. The view above stated of the historical independence of ilis kupono and, therefore, of the ilis of Koula and Manuahi disposes of the first contention, adversely to the Territory, but leaves the second contention for consideration.

In his written opinion the trial judge said that he had "consented to hear the cause on the condition that the issue be confined to the sole question of title to the normal daily surplus of waters arising and flowing in 'Hanapepe valley' above the southerly junction of Manuahi and Koula valleys;" that it was "alleged in the petition and conceded in the answers that there is a normal daily surplus of waters in this valley;" that it was "assumed for the purposes of this case that the diversion complained of by the petitioner does not interfere with the ancient rights of riparian owners of the lands lying below and south of the ilis owned by the respondents;" and that "if there be any interference with the ancient rights as a matter of fact, such questions are left open to the determination of the appropriate water commissioner." Similarly in this court the parties are agreed that there is normally a surplus of water flowing in the stream over and above the quantity required to satisfy the needs of certain lower kuleanas and other lands in the ahupuaa of Hanapepe which have become entitled to water by prescription or to which water rights were appurtenant at the time when the land commission awards thereof were made. They are agreed that this suit is not intended to settle conflicts, if there are any, between the respondents and the owners of the kuleanas or other lower lands entitled to water by prescription or by appurtenance and that the decision of this court will relate only to the surplus of water not required for such lower prescriptive or appurtenant rights. I shall, therefore, so regard the issue.

In litigation in these islands concerning water the term "prescriptive rights" has been often used, and correctly, to denote those rights which, although not owned by certain lands originally, were acquired, without conveyance, by the actual, open, notorious, continuous and hostile use of those waters for the statutory period of limitations. The same term has, however, sometimes been used to denote or to include rights not shown to have been acquired adversely or by prescription but which were being enjoyed by and were regarded as appurtenant to certain lands at the date when those lands first passed into private ownership by the generosity of the king and with the administrative assistance of the land commission. Whenever it has appeared that a kuleana or perhaps other piece of land was, immediately prior to the grant of an award by the land commission, enjoying the use of water for the cultivation of taro or for garden purposes or for domestic purposes, that land has been held to have had appurtenant to it the right to use the quantity of water which it had been customarily using at the time named. In some instances a mere reference to the land in the award or in the records of the land commission as "taro land" ("aina kalo" or "loi kalo") or as "cultivated land" ("aina mahi") has sufficed to lead to and to support an adjudication that that land was entitled to use water for agricultural purposes. Sometimes the testimony of witnesses who appeared before the land commission in the hearings leading up to the award that the land was taro land or cultivated land, or other statements substantially to that effect, have sufficed to support a similar adjudication. In these latter instances the adjudication that the lands had water rights was not dependent upon any use with continuity or hostility for any particular period of time but merely followed from the fact that just prior to the grant of the awards water was being used on

those lands, presumably by right. These are the rights which in this opinion are called "appurtenant" as distinguished from "prescriptive." The prescriptive rights and these appurtenant rights are the two classes which have been most often·involved in litigation and which are most often referred to in our reports of decided cases. In the course of a series of controversies concerning water rights in the ahupuaa of Wailuku another class of rights came to be considered, to-wit, the rights to the surplus water of an ahupuaa, meaning by "surplus water" all water not required for the satisfaction of the prescriptive or the appurtenant rights just described. This series of cases is to be found reported in *Peck* v. *Bailey,* 8 Haw. 658; *Lonoaea* v. *Wailuku Sugar Co.,* 9 Haw. 651; *H. C. & S. Co.* v. *W. S. Co.,* 14 Haw. 50; *H. C. & S. Co.* v. *W. S. Co.,* 15 Haw. 675; and *H. C. & S. Co.* v. *W. S. Co.,* 16 Haw. 113. In the first of these five cases prescriptive rights and appurtenant rights only were adjudicated. In the second prescriptive rights were considered; but the court in the introductory paragraphs of its opinion said: "So, also, when the rains, either those falling in the mountains only, or when they were general, made freshets in the river, the Wailuku plantation would run off into reservoirs surplus water that otherwise would run into the ocean. This conservation of storm water was free to all who desired to appropriate it and we see no valid objection to its practice being continued. It would become objectionable if the plantation or any party by the creation of immense reservoirs or other mechanical structures should take all the storm water and deprive others of an opportunity to do the same." *Lonoaea* v. *W. S. Co.,* 9 Haw. 651, 659. In the third it was claimed that in the second the court had rendered a decision relating to the rights of the parties in the surplus waters of the stream. In a carefully considered and exhaustive opinion the court (in the same third case)

stated its conclusion that there had been, in the second opinion, no decision relating to the surplus waters. In the fourth (the same suit as the third) the court devoted itself to a decision of the question of the ownership of surplus waters, a question which until that day had remained undecided in this jurisdiction. Defining for itself the term "surplus water" as meaning "the water, whether storm water or not, that is not covered by prescriptive rights and excluding also riparian rights, if there are any," the court said: "Surplus water. This, in our opinion, is the property of the konohiki, to do with as he pleases, and is not appurtenant to any particular portion of the ahupuaa. By ancient Hawaiian custom this was so. Originally the King was the sole owner of the water as he was of the rest of the land and could do with either or both as he pleased. In later years, the rule seems to have been for him not to dispossess tenants of their lands except for cause and to that extent, perhaps, he would not have deprived cultivators of the water to which their lands were by usage entitled. But no limitation, so far as we can learn, ever existed or was supposed to exist to his power to use the surplus waters as he saw fit. There is no reason for supposing that such water was regarded as appurtenant to one portion of the arable land of an ahupuaa and not to another portion or for supposing that it was appurtenant to the arable land and not to the remainder of the ahupuaa. During recent years konohikis have in many instances diverted from the ahupuaa the surplus water either wholly or in large part. An argument based upon public policy or upon the necessity or wisdom of encouraging the cultivation of the soil upon a scale unknown and impossible in ancient times, cannot be of assistance, for a determination that the surplus water belongs, in accordance with ancient Hawaiian custom, to the konohiki is not less in favor of an enlarged measure of

cultivation than would be a determination that such water belongs to the present holder of a particular portion of the ahupuaa." *H. C. & S. Co.* v. *W. S. Co.,* 15 Haw. 675, 680, 681. It added in support of its conclusion: "This was the view entertained by Chief Justice Allen thirty-seven years ago and expressed by him relative to this very ahupuaa in the suit of *Peck* v. *Bailey* (8 Haw. 658, 661, 662, 663, 671), the parties in which were the predecessors in interest of the present respondent. 'There can be no difference of opinion,' said that judge, 'that the complainants were entitled to all the water rights which the lands had by prescription at the date of their title. By the deed, the water courses were conveyed and a right to the water accustomed to flow in them. The same principle applies to all the lands conveyed by the king, or awarded by the land commission. If any of the lands were entitled to water by immemorial usage, this right was included in the conveyance as an appurtenance. An easement appurtenant to land will pass by a grant of the land, without mention being made of the easement or the appurtenances. But if lands had no such rights, and no additional grant of water rights was made, it certainly could take nothing by having been a portion of the ahupuaa. * * * The complainants contend that they have the right of lord paramount to the Wailuku river. The grantor of a large portion of the complainants' land had the same right as his ancestor, who was the konohiki of this ahupuaa, subject to the rights of tenants, which were afterwards confirmed by the land commission. These rights were certain taro patches and the water necessary for their cultivation. This was a limitation to the entire control of the river. The grantor of complainants has conveyed portions of this ahupuaa to several persons. Each grantee will hold all that has been conveyed to him, unless it should conflict with a previous conveyance. This in-

cludes the water courses on their lands, and all the water which the lands had enjoyed from time immemorial. The deeds to defendants were from the same source originally and conveyed similar rights and privileges as appurtenant. So it appears by the deeds to the complainants and defendant, that a large part of the ahupuaa has been conveyed to them by the konohiki, with all the rights and privileges appertaining. By the evidence it appears that there are large valuable water rights appurtenant to these lands. It is very evident, therefore, that the complainants cannot be lords paramount over the Wailuku river, but they have certain valuable rights of water as an appurtenance to the land conveyed to them, and nothing more. They cannot claim any rights except what they have acquired by their deeds and leases, and the defendant is in the same category. Both are limited in their rights of water, and there is not the slightest ground for declaring either as lord paramount; as much reason, as a matter of principle, in the one case as the other. The difference consists merely in the far greater possessions of the complainants. * * * The water courses on this ahupuaa have existed from time immemorial, and were doubtless made by the order of some ancient king, and when the late king conveyed these lands to the proprietors, the rights of the water courses, in their full enjoyment, were included as an appurtenance. While the king owned this ahupuaa, he had a right to apply the water to what land he pleased, but after the water courses were made, more especially after being in use from time immemorial, his conveyance of the land would include them, the same as his conveyance of the land bordering on the Wailuku river will include the rights of water in said river, which had not been before granted.' " *Ib.*, 681, 682.

That ruling (15 Haw. 675, 680, 681) is as applicable to the surplus waters of an ili kupono as it is to those of an

ahupuaa. .The konohiki of an ili kupono (independent ili) bore the same relation to the king as did the konohiki of an ahupuaa. The ili kupono was his to enjoy to the same degree and subject to the same limitations only as was an ahupuaa with reference to its konohiki. So, also, the ruling is as applicable to the surplus waters of an ahupuaa which, if undiverted, would flow in their course to the sea through two or more ahupuaas as it is to those which would flow in their whole course to the sea through one ahupuaa only. . No difference in history or in principle is discernible. To hold that the lower ahupuaas are entitled of right to a share of the waters would be to hold that those waters do not belong wholly to the konohiki of the ahupuaa of origin to do with as he pleases. In the *Wailuku* case it was held that the surplus waters are not appurtenant to any particular part of the ahupuaa or to any particular part of the arable lands. How can it consistently be held that a part of them is appurtenant to lands, tillable or nontillable, of other ahupuaas? I think that it cannot be.

As in the *Wailuku* case, so in this case no argument of convenience or in aid of production of crops can be successfully urged, for the diversion sought to be enjoined is in aid of cultivation of cane lands at Makaweli. If an injunction were granted, the waters would be used in aid of cultivation of cane lands in Hanapepe.

The "general principle" declared in *Davis* v. *Afong*, 5 Haw. 216, 221, that "a landowner is entitled to the use of the water originating upon his land, subject only to the rights which others may acquire by prescription," if it is applicable to a flowing stream in an ahupuaa would lead to the same result. My conclusion, however, in the case at bar is based solely, as was the decision in *H. C. & S. Co.* v. *W. S. Co.*, 15 Haw. 675, upon the historical considerations there recited.

But on behalf of the Territory it is contended that a contrary conclusion was reached in *Carter* v. *Territory,* 24 Haw. 47. The court there said: "There remains to be considered only the claim of the petitioner to the right to storm or freshet waters of the Waikoloa stream on the ahupuaa of Ouli. Where a stream flows through a single ahupuaa it has been decided that as between the ahupuaa and kuleanas therein, or portions of the ahupuaa conveyed without rights to surplus water, the surplus waters of the stream belong to the ahupuaa. *Peck* v. *Bailey,* and *Haw. C. & S. Co.* v. *Wailuku S. Co., supra.* The question here presented, as to the rights in the surplus waters of a stream which flows from one ahupuaa into another, is one of first impression. We think it must be settled according to the principles applicable to riparian rights at common law. That is to say, each ahupuaa is entitled to a reasonable use of such water, first, for domestic use upon the upper ahupuaa, then for the like use upon the lower ahupuaa, and, lastly, for artificial purposes upon each ahupuaa, the upper having the right to use the surplus flow without diminishing it to such an extent as to deprive the lower of its just proportion under existing circumstances. Gould on Waters (3d ed.) Secs. 206 et seq.; 3 Farnham on Waters, Sec. 600 et seq." The respondents' reply to this contention is that the court in that case actually awarded to the Territory as owner of the lands on which the stream arose all of the waters of the *"normal surplus"* and that the decision relating to a division between the ahupuaa of origin and a lower ahupuaa related merely to the "surplus *freshet* waters." In that case the contest related to the waters of the Waikoloa stream which had its source upon the ahupuaa of Waimea of which the Territory was the owner and in the position of konohiki. The petitioner was the owner of the ili of Waikoloa, through which the stream flowed, but which con-

tributed practically no water to its flow. The stream, when there was sufficient water in it, flowed to the sea through a lower ahupuaa called Ouli, the latter being owned by the petitioner. Prescriptive rights and appurtenant rights (in the sense above defined) were claimed by the petitioner on behalf of various parcels of land owned by it. The petitioner had replaced a dam, originally composed of earth and rocks, with a concrete structure and claimed the right to divert water from the stream by means of various ancient ditches. The Territory had constructed a dam across the Waikoloa stream at a point higher than that of petitioner's dam and by means of that dam and of pipelines was distributing water to a number of homesteaders in Waimea for domestic purposes. Many issues were presented to the commissioner and on appeal to this court for adjudication, issues relating to ancient appurtenant rights, to prescriptive rights, to nonuser and abandonment, to the quantities of water to which each land was originally entitled or had later become entitled by prescription, and perhaps to other subsidiary and yet more or less important subjects. This court, while finding that the petitioner owned various lands which were entitled to some water, was unable upon the evidence adduced to determine the precise quantities to which those lands were entitled. For that reason, and evidently in part also because the petitioner, towards the conclusion of the trial before the commissioner and in this court, had stipulated that "we do not ask the court to remove the dam," (meaning the Territory's dam) "we are willing that the system" (meaning the Territory's system) "remain there subject to an acknowledgment of petitioner's right to the water up to whatever amount the court decrees. We want title to the water and want those people to be in a position to be compelled to recognize it. * * * We will ask leave to amend the prayer so that we do not seek

to remove this dam,"—for these reasons, apparently, the court, without any statement of its reasoning in that connection, declared, *inter alia,* in its concluding paragraph that "the Territory is the owner of all the waters of the Waikoloa stream to the extent of the ordinary or normal flow." Undisputed evidence had made it clear that within the memory of man the rainfall in the district of Waimea had gradually and greatly lessened, that the Waikoloa stream in times of earliest recollection had normally carried large quantities of water sufficient for the needs of the very numerous inhabitants of that district and sufficient to supply the extensive network of major and minor ditches through miles of territory, remnants of which ancient ditches were still plainly visible at the time of the trial; but that owing to the diminution of the rainfall the stream at the time of the trial was carrying markedly smaller quantities of water, not sufficient in normal times for all or any very large part of the district originally covered by the ditch system and that there was no normal flow in the stream in excess of such quantities as the petitioner and the Territory were more recently in the habit of diverting. And yet there was no finding or adjudication in the opinion under review that the waters which the Territory was diverting by its dam and pipe system were waters which the Territory could divert under any claim or right other than that of owner of the normal surplus flow. The unambiguous language used by the court in its ultimate conclusion was that, subject only to the prescriptive and appurtenant rights (undetermined as to quantities) of the lands of the petitioner, "the Territory is the owner of all the waters of the Waikoloa stream to the extent of the ordinary or normal flow." To this extent the conclusion there reached was in accord with the ruling in *H. C. & S. Co.* v. *W. S. Co.,* 15 Haw. 675.

Perhaps what has been said would in itself suffice to

show that both under *Carter* v. *Territory* and under the *Wailuku* case last referred to the result in the case at bar must be that the respondents are the owners of the normal surplus flow of the Koula and Manuahi streams and that an injunction cannot be granted. But such a disposition of the matter would be unsatisfactory and probably misleading, first, because that method of treatment might well carry with it the implication that in my opinion there is a distinction between surplus waters of the normal flow and surplus freshet waters and, second, because there is no evidence in the record tending to show that the two dams which are being maintained by the respondents in Koula do not or cannot divert freshet waters. What precise line is to be drawn in practice between the higher normal flows and the smaller freshets is not easily apparent. It would seem that after a period of comparative drought the first waters to come can well be those of a storm. In such an event, could it be said that all of the onrushing waters which the dams could divert would be waters of the normal flow and that all waters going over the dams would be freshet waters? It is to be doubted that any such distinction in practice could be successfully asserted.

The fact that, as found by the trial judge, even in dry weather water seeps or drains into or otherwise reaches "the bed of the Koula stream" below the two dams "and above the southerly boundary of respondents' property and into the Hanapepe river below respondents' ilis" may tend to show that, like many other areas of Hawaii's ancient lava fields, the land there is highly porous or full of subterranean passages through which waters flowing in the stream above the dams pass under the dams and come to the surface lower down and may also tend to show that rain falls below the two dams forming little streams which feed the main stream of Koula; but it does not show that

the waters which are or can be diverted by the two dams are not, in whole or in part, waters of floods or freshets.

It is my opinion that there is no distinction in history, in principle, or in law between surplus waters of the normal flow and surplus waters which come in freshets as a result of storms. As above stated, the term "surplus waters" is here used to designate all waters not required for the satisfaction of prescriptive or appurtenant rights in lower kuleanas or other lands. It was in that sense that the term was used in *H. C. & S. Co. v. W. S. Co.*, 15 Haw. 675. In that case the term was expressly defined to include storm and freshet waters. The court there said that for its purposes "surplus water" was "the water, *whether storm water or not,* that is not covered by prescriptive rights and excluding also riparian rights, if there are any." Counsel for the respondents urged at the oral argument, referring to the *Lonoaea* decision, that it had been there held that storm and freshet waters were divisible between the various lands through which they passed. As pointed out above, the statement by the court in that case that the "conservation of storm water was free to all who desired to appropriate it and we see no valid objection to its practice being continued," was expressly held, upon the plea in bar (14 Haw. 50), not to have been a judicial adjudication but to have been "merely general introductory observations such as are frequently made in water cases," and "not intended to fix the rights of the parties." The net result of that series of cases was, first, that in the *Lonoaea* case there was no adjudication relating to storm water and, second, that in 15 Haw. 675 it was expressly held that storm water was a part of surplus water, as clearly so as a normal surplus would be, and that all of the surplus, "whether storm water or not," was the property of the konohiki to do with as he pleased.

If a distinction is to be drawn between freshet waters

and normal surplus waters, there must be a reason for it. None occurs to me. The only reason suggested in answer to a question from the bench was that in practice freshet waters cannot be diverted. That, however, does not seem to me to be well founded in fact. Freshet waters, at least those of some freshets, can be diverted. If the dams are made large enough and strong enough, and if the ditch and pipe system is of sufficient capacity, the waters will flow in the ditch and not downstream. The mere state-ment ought to suffice, of course, that if the waters of a stream, whether freshet waters or those of an ordinary flow, are allowed by the konohiki of the upper ahupuaa to pass downstream to other ahupuaas, such waters are "wild," as it were, and are subject to capture by whoever can capture them. In the nature of things the waters, once they pass beyond the confines of his land, no longer belong to the konohiki of the upper ahupuaa. This, how-ever, does not militate against the possibility of capture and diversion by the upper konohiki of all of the waters of smaller freshets and of some at least of the waters of extraordinary freshets which do not destroy and carry away the dams.

The ruling in the *Carter* case that "where a stream flows through one ahupuaa into another each ahupuaa is entitled to a reasonable use of the surplus water of the stream according to the principles applicable to riparian rights at common law," even construed, as it should be, as referring to *freshet* surplus and not to normal surplus, should, I think, be disapproved. It is not in keeping with the earlier decision in *H. C. & S. Co.* v. *W. S. Co.,* 15 Haw. 675. While it is, perhaps, technically true that, as stated in the *Carter* case, "private water rights in Hawaii are governed by the principles of the common law of England except so far as they have been modified by or are incon-sistent with Hawaiian statutes, custom or judicial prece-

dent," that statement is of very little, if any, consequence or significance in view of the widely prevailing Hawaiian customs and the judicial precedents long since established with reference to water rights in this Territory. Our system of water rights is based upon and is the outgrowth of ancient Hawaiian customs and the methods of Hawaiians in dealing with the subject of water. No modifications of that system have been engrafted upon it by the application of any principles of the common law of England. To apply the principle of riparian rights to the matter of surplus freshet waters as was done in the *Carter* case is entirely at variance with preceding history and judicial precedents.

Water for domestic purposes on a lower ahupuaa is in any event assured under Hawaiian law. Every portion of land, large or small, ahupuaa, ili or kuleana, upon which people dwelt was, under the ancient Hawaiian system whose retention should, in my opinion, continue unqualifiedly, entitled to drinking water for its human occupants and for their animals and was entitled to water for other domestic purposes. At no time in Hawaii's judicial history has this been denied. Whenever it is proven that people dwelt, at the time of the award of the land commission, upon a piece of land awarded, it will be easily found and adjudicated that that piece of land was and is entitled to water for all domestic purposes. Under similar circumstances lands of the king or of any other konohiki which have remained unawarded would be similarly treated. These rights to water for drinking purposes and for other domestic uses are included in the ancient appurtenant rights hereinabove referred to. As already stated, the surplus water, whether normal or freshet, which is the subject of controversy and adjudication in the case at bar does not include, but by exclusion provides for, ancient

appurtenant rights, which latter include rights to water for domestic purposes.

Bearing always in mind that in the *Carter* case all of the waters of the normal surplus were declared and decreed to be the property of the owner of the ahupuaa of origin, the riparian rule to the extent that it was adopted in that case, i. e., merely with reference to freshet waters, would not be the means of averting disaster or inconvenience to any lands in a lower ahupuaa which were not otherwise entitled to water. Storms and freshets, it is generally known, are the exception and not the rule. They come at intervals that are both long and irregular. No crops can be grown which are dependent solely on freshet waters.

It is said that the common-law doctrine of riparian rights is so inherently just, sound and wholesome that it ought to be adopted as the law in Hawaii. Save only as to one feature of the *Carter* case, that relating to freshet waters, it is not and never has been the law in Hawaii. It is utterly inconsistent with the system which from time immemorial has been recognized and enforced in these Islands. Its adoption now with reference to normal surplus waters would alter established rights. The riparian doctrine, as I understand it, is that owners of lands adjacent to a natural stream are entitled to correlative rights in the waters of that stream,—that each is entitled to a reasonable use of those waters and to so use them that other owners on the banks of the same stream may have a like reasonable use of the same waters, unaffected in quality and undiminished in quantity except in so far as made necessary by the reasonable use of others above. In other words, some of the characteristics of riparian rights under the common law of England were as follows: they arise from and depend upon the fact that the land is *on the bank* of a natural stream. The word "riparian"

is derived from the Latin word "ripa" which means a bank. It is a right to use first for domestic purposes and, second, for what are termed "artificial" purposes, which latter include mining, mechanical uses and irrigation. For all of these artificial purposes the use must be reasonable and correlative, that is, with due regard to the equal rights of all other riparian lands on the same stream. No precise definition has been attempted, applicable to all cases, as to what is "a reasonable use." That has been held to depend on the circumstances of each particular case and to be determinable by the jury. While for the drinking purposes of men and animals all water in the stream may if necessary be taken, nevertheless, for irrigation and other artificial purposes no one riparian land can take all the water from the stream. All unused water diverted must be returned to the stream. The owner of the riparian land does not own the water. He has merely a *usufruct* while it passes along. He cannot separate the water from the riparian land and sell it or lease it, apart from the land, for use on a nonriparian land. *Stockport* v. *Potter,* 3 H. & C., 300, 324, 326 (159 Eng. Repr. 545, 555, 556); *Lake Superior Co.* v. *Emerson,* 38 Minn. 406, 408; 1 Farnham, Waters & Water Rights, 609; *Atchison* v. *Peterson,* 20 Wall. 507, 512; *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 702. If the owner of a riparian land conveys a part of it which does not abut on the stream, the conveyance does not carry with it any riparian right to water. The land conveyed in such an instance becomes nonriparian. Lands not on the bank of a stream have none of these rights. Lands beyond the "divide" or "in another watershed" are not riparian to the first stream. 3 Farnham, Waters & Water Rights, 1903.

In passing, it may not be out of place to note that in the case at bar the riparian system would not be preferable to the ancient Hawaiian system. The evidence shows

that about 1900 acres of land, tillable in cane, is a part of
the complainants' ahupuaa of Hanapepe. This tract of
tillable land does not immediately adjoin the stream but
is situated on higher land some little distance away from
the stream. It may be assumed, however, for the purposes
of this opinion that under present conditions it is to be
regarded as being on the bank of the river and therefore
riparian. The evidence also shows that for many years
last past the waters diverted from Koula by the Gay &
Robinson ditch system, which diversion is the one here
sought to be enjoined, have actually watered a total of
5200 acres of cane lands, and have been sufficient to water
over 7000 acres of cane lands, situate at Makaweli. The
Makaweli lands, however, are not, within the meaning of
the doctrine, on the banks of the Koula stream or of the
Hanapepe river below. Between the Koula stream and
the Makaweli lands are the Manuahi valley and stream
and one or more other valleys and streams. There are
less than 50 acres of tillable lands in Koula valley, prob-
ably most of them having ancient appurtenant rights to
water and not needing, therefore, surplus water. If the
doctrine of riparian rights is to be applied to the Koula
stream and its continuation down the Hanapepe stream,
the practical result will be the discontinuance of the use
of its waters on the 5200 acres or more of Makaweli lands
and the substitution of a use on 1900 acres of cane lands
in Hanapepe, plus possibly a few acres in Koula valley.
Since this discussion applies only to surplus waters, and.
ancient appurtenant and prescriptive rights in favor of
any and all lands are excepted and provided for by the
very definition of the term "surplus waters," a large
quantity of water would have to be allowed to flow un-
restrained into the ocean, unused and wasted. For it must
be remembered in this connection that nonriparian lands
will not be entitled, either primarily or by grant, to share

in the enjoyment of these waters. The mere fact that a taking, for use on Makaweli lands, of water not needed for the 1900 acres in Hanapepe might be held to be *damnum absque injuria,* would not render the taking lawful or bring it within the authorization or scope of the doctrine. It is to be remembered, in addition, that even the use on the 1900 acres could continue at best only as long as they remained in one ownership. If, as is generally supposed in this community, it is the purpose of the Territory to subdivide that tract into comparatively small lots for homesteading purposes, only those few of the subdivided lots which are patented or agreed to be patented to homesteaders and which actually abut on the stream will be riparian and will be entitled to riparian rights. All other lots, nonadjacent to the stream, will have no riparian rights whatever and even larger quantities of water will thus go to waste in the sea.

The doctrine itself, in my opinion, irrespective of the results of its application to the lands and the facts of the case at bar, is not suited to conditions in this Territory. As in some or all of the western states of the mainland the doctrine of riparian rights was discarded as unsuited to conditions and the doctrine of prior appropriation was adopted, so here, as it seems to me, both of those doctrines have been and should continue to be discarded as unsuited to our conditions. Under the English system only riparian lands would have water. Many of our largest and most fertile tracts of land are nonriparian and would have no water and no agricultural development under that system. Even of the kuleanas awarded in 1845 or thereabouts to the common people, the poorer people, a great many, and perhaps most of them, were nonriparian and would never have been entitled and would not now be entitled under that system to any water from the streams. The system devised and wisely provided by the ancient kings and

chiefs permitted of the construction and maintenance of a large network of artificial ditches, some larger and some smaller, leading out from the main streams and spreading with their auxiliaries so as to reach most, if not all, of the little holdings of the common people, as well as all of the portions of larger lands which the konohikis showed themselves able and willing to cultivate. That system provided for every kuleana, ili and ahupuaa fed by those ditches more water and greater rights than those which would have been available under the riparian system, even as to those lands which were themselves riparian. I am referring to well established law, set forth in numerous reported decisions. To lands now having prescriptive rights no reference is here made, for they have more than they were anciently entitled to. But the ancient appurtenant rights themselves gave to the lands receiving water from any of these ditches all of the water, in many instances, for prescribed periods of time, as for certain hours on each day or for certain days or nights in each week or in each two or three weeks. They permitted all the water in some of the ditches to be taken during the prescribed hours or parts of days even though during those periods of time no water remained to flow down the stream to other lands on the banks. The water appurtenant to each land belonged to the owner of the land and was severable therefrom and was transferable either with or without grant to other lands irrespective of whether such other lands were riparian or nonriparian (provided only that no injury was by the diversion made to the rights to other lands). There was no limitation to "a reasonable use" for the lands entitled to take from any of the ditches. The admeasurement was by time and by nature and size of dams and ditches. There was no limitation in favor of lands within the same watershed or valley. It could be

diverted to other watersheds subject only to the same proviso already stated above.

To my mind, the ancient Hawaiian system provided more liberally than did the English system, in favor of riparian lands and in favor of nonriparian lands and is far better suited to the development of the agricultural lands of this Territory.

Water rights, it need hardly be added, have financial value. The legal possibility that some of the water may be wasted by an owner is no justification for depriving him of his right thereto without due compensation. Such a possibility, moreover, is more theoretical than it is actual. As long as fertile lands are available upon which surplus waters may be used, the owner of those waters, even though an individual as distinguished from the state, can be depended upon to take the water to the land or to permit others to do so for a just compensation. Human selfishness and good, sound, human judgment sufficiently insure this.

Chief Justice Allen, who rendered the decision in *Peck* v. *Bailey,* reported in 8 Haw. 658, did say at page 662: "A riparian proprietor has the right to enjoy the benefits of a flow of water as an incident to his estate, and he can use the water for irrigation, watering his cattle, and other domestic purposes, provided he does not materially diminish the supply of water or render useless its application by others." But he made no application of that doctrine to the facts of the case before him. He made no adjudication or award of any riparian rights to any riparian lands. He stated that it appeared from the evidence that a part, "a small portion," of the land of the complainants was "bounded by the river;" but he did not award any additional water to the complainants by reason of the proven location of some of the complainants' land on the bank of the river. On the contrary he said (p. 661) : "How far

this would affect its riparian rights, is not material in this case, for the reason that the right which it enjoys by the Kalaniauwai is far more than its riparian right." And at page 670, referring generally to all the claimants before him, he further said: "The counsel on both sides have made frequent reference to the rights of riparian proprietors at common law. The principles which govern them have very little practical application to this case. A riparian proprietor has a qualified property in the soil to the thread of the stream, with all of the privileges annexed thereto by law. He has a right to divert the water for irrigation, but it can only be done so as not to injure other proprietors. It is often a nice question where the right ends and the wrong begins in the scale of admeasurement of such diversion. If it is made only of such water as the complaining party could not have used for a beneficial purpose, and made in a reasonable manner and for a proper purpose, an action will not lie. *If the rights of these parties were limited to those of riparian proprietors, they would be much less than they are.*" In other words, such consideration as he gave to the subject of riparian rights was intended merely to show the inapplicability of the doctrine and the greater advantage to the parties before him of their ancient appurtenant, as well as prescriptive, rights.

After a careful reexamination of all Hawaiian cases relating to water law I find none except the *Carter* case, *supra,* which makes any award of riparian rights as such. All the reported Hawaiian cases with that exception recognize and enforce the ancient Hawaiian system and that case also recognizes and enforces that system in all respects save only in relation to the subject of surplus waters that come in freshets. All Hawaiian cases on the subject, including the *Carter* case, award water of the normal surplus to the konohiki of the land of origin.

It is far more logical and more desirable to correct now the one partial error of the *Carter* case in respect to freshet surplus, thus leaving the whole body of our decisions consistent and favorable to the best interests of our agricultural lands and giving due recognition to the principle of *stare decisis,* than to upset the unvarying decisions concerning normal surplus and to endanger the foundations of the whole Hawaiian system and perhaps eventually the system itself.

In *City Mill Co.* v. *Hon. S. & W. Com.,* 30 Haw. 912, only artesian waters were involved. The first artesian well in this Territory, then Kingdom, was dug in the late seventies of the last century. The ancient Hawaiians had none and knew nothing of them and therefore had no customs, rules or regulations concerning their use or their ownership. Hence the necessity in the case last cited of looking elsewhere for principles which would be applicable and just. With reference to surface waters the ancient Hawaiians did have customs, rules and regulations amounting to law (the word "kanawai" now meaning laws originally meant rules relating to water). I can see no justification for discarding ancient Hawaiian views and rules relating to the power and privileges of the konohiki concerning the narrower subject of surplus freshet waters or concerning the broader subject of all surplus waters, whether of storm waters or not, while at the same time adhering to the ancient Hawaiian system in all of its other methods and provisions.

For these reasons the decree appealed from, which denies the injunction sought and dismisses the bill, should, in my opinion, be affirmed.

*Marguerite K. Ashford (Thompson, Beebe & Winn* with her on the briefs) for the Territory.

*A. G. M. Robertson (Robertson & Castle* on the briefs) for Gay & Robinson.

R. B. Anderson (*Prosser, Anderson & Marx* on the brief) for the Hawaiian Sugar Co.

OPINION OF PARSONS, J., CONCURRING IN PART AND DISSENTING IN PART.

I concur in the foregoing opinion, both in its reasoning and in its conclusion in so far as the same refers to respondents' rights in the normal surplus waters of Koula stream; and I concur in the affirmance of the decree appealed from which denies the injunction sought and dismisses the bill. I do not, however, concur in that part of the opinion which disapproves of *Carter* v. *Territory,* 24 Haw. 47, 71, to the extent that the latter case applies the common-law rule of riparian rights to surplus flood and freshet waters—and this for the sole reason that such disapproval is not necessary to a determination of the issues before us. In defining the issues before him the circuit judge in his decision said in part: "Moreover, the evidence clearly showed that the diversion maintained by respondents did not attempt to impound the entire water supply even of Koula valley. * * * The evidence clearly showed that *even in dry weather* water seeped into or drained into or otherwise got into the bed of Koula stream below the diversion dams and above the southerly boundary of respondents' property and into the Hanapepe river below respondents' ilis. Hence no question arises in this proceeding as to the appropriate diversion, if any, of abnormal or freshet surpluses. The only question which this court will attempt to decide is the right of the respondents to continue to maintain the diversion of a part or *all* of the normal daily surplus of waters arising above the junction of the Manuahi and Koula streams north of the southerly boundaries of the ilis of Manuahi and Koula." In his finding of facts the trial judge said among other things: "There is no evidence to show that the re-

spondents have attempted to appropriate the storm or freshet waters." This appears to be the understanding of the respondents themselves. In their first brief (p. 22) the respondents Gay & Robinson said: "We are not dealing with storm or freshet waters in the case at bar." The respondent, the Hawaiian Sugar Company, Limited, in its brief (p. 16) said: "The size of the dam further illustrates that the only waters which are diverted are the normal surplus waters, the dam being insufficient to retain any part of freshet or storm waters. This fact is further substantiated by the testimony of Francis .Kanahele." Quoting further from the last named brief (p. 23): "We submit that the konohiki of the ili has the title to the surplus waters in question and further that the doctrine of the *Carter* v. *Territory* case, in so far as it applies to storm or freshet water, has no application here."

The trial judge in conclusion held: "That the respondents at bar are legally entitled, by reason of their fee simple ownership of the sources of the water supply arising in the ilis of Manuahi and Koula to divert and use as their own, all the normal daily surplus of waters of the Koula stream, so long as this diversion under that claim of ownership does not interfere with the established prescriptive rights of lower land owners in Hanapepe valley for domestic purposes and for wet agricultural use." The case below, therefore, presented no issue upon the question of rights to surplus storm and freshet waters; the judge expressly refused to consider that subject and his decision, as above set forth, dealt exclusively with the normal daily surplus.

In *Carter* v. *Territory, supra,* however, the question above referred to was directly involved and was decided by this court. The claims of the petitioner are set forth in the opinion on pages 49 and 50 of the above cited report. Quoting from the top of page 50: "The right to the

surplus freshet water of the stream as it flows into and upon the ahupuaa of Ouli * * * was claimed." This claim was disposed of as follows (quoting from p. 70): "There remains to be considered only the claim of the petitioner to the right to storm or freshet waters of the Waikoloa stream on the ahupuaa of Ouli. Where a stream flows through a single ahupuaa it has been decided that as between the ahupuaa and kuleanas therein, or portions of the ahupuaa conveyed without rights to surplus water, the surplus waters of the stream belong to the ahupuaa. * * * The question here presented, as to the rights in the surplus waters of a stream which flows from one ahupuaa into another, is one of first impression. We think it must be settled according to the principles applicable to riparian rights at common law. That is to say, each ahupuaa is entitled to a reasonable use of such water, first, for domestic use upon the upper ahupuaa, then for the like use upon the lower ahupuaa, and, lastly, for artificial purposes upon each ahupuaa, the upper having the right to use the surplus flow without diminishing it to such an extent as to deprive the lower of its just proportion under existing circumstances." That what was said in the passage last above quoted, in applying the common-law rule of riparian rights to surplus water, referred to surplus *storm* and *freshet* waters only is shown by its introduction above set forth, by the court's above-quoted recital of the claims of the petitioner and by the concluding statement on pages 70 and 71 of the report, which, omitting parts hereto inapplicable, is as follows: "We hold, therefore, that subject to the vested appurtenant rights of the petitioner and the individual respondents (who were not defaulted) to water for domestic use upon their respective lands, and subject further to the right of the petitioner to water for artificial purposes as below stated, the Territory is the owner of all the waters of the Waikoloa

stream to the extent of the ordinary or normal flow; * * * that the petitioner is entitled to the *surplus normal flow,* if any, after all domestic requirements are satisfied, for artificial purposes to the extent of the quantity to which the lands owned by him were entitled for such purposes by custom at the time the lands first passed into private ownership, whatever that quantity was; * * * and that the *surplus flood and freshet waters* of the Waikoloa stream are subject to the reasonable use of both the government and the petitioner as owners respectively of the ahupuaas of Waimea and Ouli, for the purposes and in the manner above stated." (The italics are mine.) Thus a clear distinction is made between the rule applicable to the surplus normal flow and that applicable to the surplus flood and freshet waters.

This distinction is still further emphasized in the decree which treats in separate paragraphs, among other things, (a) of the normal flow, (b) of the surplus normal flow and (c) of the surplus flood and freshet waters. Paragraph I of the decree holds that, subject to the rights set forth in the above-quoted decision, "the Territory of Hawaii is the owner of all the waters of the Waikoloa stream * * * to the extent of the ordinary or normal flow;" paragraph VI decrees, among others things, "that the lands named in said schedule 'A' aforesaid of the said petition are respectively entitled to the surplus normal flow waters, if any, of the said Waikoloa stream," after requirements elsewhere decreed are satisfied; and paragraph IX decrees "that the surplus flood and freshet waters (not the ordinary or normal flow waters) of the Waikoloa stream are subject to the reasonable use of both the Territory of Hawaii and the said petitioner as owners respectively of the ahupuaas of Waimea * * * and Ouli," in conformity with the rule of riparian rights set forth as hereinabove quoted from the decision. From the

foregoing it is apparent that this court in the *Carter* case (a) did not apply the riparian rule to surplus normal flow and (b) did apply that rule to surplus storm and freshet waters.

In view of the fact that the right to surplus storm and freshet waters was directly in issue in the *Carter* case and of the fact that such right is not directly in issue in the case at bar, without expressing any view as to how the question should be ultimately determined I cannot concur in that portion of the opinion of the chief justice in the present case which, if concurred in, would overrule the *Carter* case in the particulars above set forth.

### DISSENTING OPINION OF BANKS, J.

As I understand the opinion of the chief justice, he thinks that the owner of an independent ili upon which water has its source and which flows by gravity through a natural channel onto the land of another person, such person, unless he has appurtenant or prescriptive rights, has no rights whatever in the water, whether normal or storm surplus, which the owner of the ili must respect. In other words, the substance of his opinion is that the owner of such an ili, except as to those who have appurtenant or prescriptive rights, is the absolute owner of the water, of whatever character, to do with as he pleases regardless of the necessities of others through whose lands the water, if undiverted, would flow.

As I understand the opinion of Mr. Justice Parsons, he agrees with the chief justice, so far as normal surplus water is concerned, but he thinks storm surplus water is not involved in the instant case and therefore reserves his opinion on that subject.

To restate in somewhat different words my understanding of the two opinions, it is that the chief justice thinks there is no difference, so far as the ownership of

water is concerned, between normal surplus and storm surplus and that *Carter* v. *Territory,* to the extent that it decides that storm surplus should be governed by the common-law riparian doctrine, should be overruled, while Mr. Justice Parsons thinks that storm surplus, not being definitely involved in the present case, the rule laid down in the *Carter* case should not at this time be disturbed.

I fully agree with the chief justice that the ownership of all surplus water, whether it be normal or storm, should be governed by the same rule. Our disagreement arises out of what that rule should be. He thinks that the rule of the absolute ownership of such water (subject to prescriptive and appurtenant rights) in the owner of an independent ili or ahupuaa was established by the decisions of the supreme court of Hawaii long prior to the *Carter* case and should be adhered to, the *Carter* case notwithstanding, while I think the rule announced in the *Carter* case is not inconsistent with preceding decisions and should be applied to normal as well as to storm surplus. This rule is so inherently just in its regulation of the use of an element that is vital to the well-being of mankind and is so consonant with natural rights and human necessities that I think it should be finally adopted as the law of this Territory.

Under the rule which the chief justice thinks should be adhered to, the owner of an independent ili or the owner of an ahupuaa could divert from its natural channel all the water that might originate on his land and utterly waste and squander it and the owner of lands lying below, through which the water would naturally flow, would (unless he had prescriptive or appurtenant rights) have no legal right to complain, although he might be in dire need of a sufficient quantity to irrigate his crops. I cannot agree with a pronouncement of the law under which it would be possible to accomplish such a disaster. It

could not be accomplished under the riparian rule which received the sanction of this court in the *Carter* case either by wasting the water or by diverting it to distant lands which have no riparian relation to the stream. Under the common law the rights of riparian proprietors are not absolute and exclusive but are correlative. "All the riparian owners through or by the side of whose land a stream naturally flows may enjoy the privilege of using it. Hence it follows that rights which are enjoyed by an indefinite number of persons cannot be absolute as to any particular right but must be relative or correlative as to all the owners on the stream." 1 Kinney on Irrigation and Water Rights, Sec. 455, p. 770.

In *City Mill Co.* v. *Honolulu Sewer and Water Com.,* 30 Haw. 912, this court, in a very able opinion written by the present chief justice, decided that, as to subterranean waters lying in an artesian basin, the rule of correlative rights should be applied. In refusing to adopt the *cujus est solum* doctrine of the common law, the court said (pp. 923-925) : "The so-called 'common-law doctrine' seems to us to be unsound. It purports to be based upon the ancient maxim, *cujus est solum, ejus est usque ad coelum et ad inferos,'* or 'he who owns the land is the owner of it, even to the heavens above and to the lowest depths below.' From that beginning it proceeds upon the theory that the water found in the land is a part of the land. When applied, however, to an artesian basin and to artesian wells, this view clearly runs counter to the facts. It may, or it may not, be applicable to waters merely oozing in or seeping through soil, but it certainly is not applicable to artesian waters which are known to flow freely and rapidly through broken rock or other materials permitting of easy passage. No artesian basin is ever found, complete in itself, under and within the boundaries of any one person's city lot. They exist usually, and the particular

basin under consideration in the case at bar exists, subjacent to large areas of land,—hundreds, and perhaps thousands, of acres. It cannot be said with any regard for the truth that an owner of a city lot or other small portion of the land over an artesian basin who, with a powerful pump takes from his artesian well all of the water that can thus be obtained therefrom is thus drawing only water which is a part of his own soil or land. The water of the whole basin will unavoidably flow towards its lowest level, that is, where the greatest suction is being applied. To permit an owner of a comparatively small portion of the land to draw water therefrom without limit would be to permit him to take water which clearly was subjacent in a large degree to the property of others. A much closer approach to adherence to the ancient maxim above quoted, that he who owns a piece of land owns it to the center of the earth, is to regard all of the owners of the land under which an artesian basin lies as owners of the waters of that basin. If a person or other entity should purchase all of a large tract of land under which an artesian basin exists, it would be easy to take the view, we think, that that owner of the land would be the sole owner of the water underneath it. If two persons or other entities should purchase each a half of that tract it would seem to be equally fair and rational to regard the two owners of the land as owners in equal shares of all of the waters. Why not, upon the same reasoning, regard all the owners of all of the many portions of such an area as co-owners of the waters in the basin? We think that they should be so regarded and that this is the view that most nearly effectuates justice and coincides with early concepts of the law as to the ownership of the soil and all within it. Their rights are correlative. Each should so exercise his right as not to deprive others of their rights in whole or in part. In times of plenty greater freedom

of use probably can be permitted and ordinarily would be permitted without question. In times of greater scarcity or of threatened scarcity or deterioration in quality of the waters, all would be required under this view to so conduct themselves in their use of the water as not to take more than their reasonable share."

I can perceive no just reason for applying the correlative rights rule, which is epitomized in the maxim *sic utere tuo ut alienum non laedas,* to subterranean waters upon which all superjacent lands are dependent for necessary moisture and not applying it to surface waters, that flow through natural channels, and to which lower adjacent lands must look for necessary moisture. It cannot be said with reason or justice that so long as the waters remain imprisoned underneath the surface of an independent ili or ahupuaa the owner of the land is not their absolute owner but has only a correlative right to their use, but that if perchance they break away from their imprisonment and find their way to the surface and there manifest themselves in springs or ponds or lakes, from which they flow through natural channels to lower levels, the owner of the ili or ahupuaa upon which they first appear becomes their absolute owner, to do with them as he pleases even to the utter ruin of others who are dependent on them. (*Miller* v. *Bay Cities Water Co.,* 157 Cal. 256.)

The ruling in the *Carter* case that "where a stream flows through one ahupuaa into another each ahupuaa is entitled to a reasonable use of the surplus waters of the stream according to the principles applicable to riparian rights at common law" is, I think, a sound and wholesome doctrine.

Nor do I believe it to be incompatible with the law as it was declared in the earlier cases which are cited in the opinion written by the chief justice. Without reviewing

in detail those cases, it seems to me that all of them dealt with situations quite different from the situation that was before the court in the *Carter* case and that is before the court in the instant case. Take, for instance, what may be termed the *Wailuku River* cases. Each one of them dealt with conflicting rights in the waters of the Wailuku River, which rises and flows to the sea within the ahupuaa of Wailuku. The quarrels that arose, therefore, were between the owners of different portions of the same ahupuaa and related to their apportional interests in the water. They were not, as in the *Carter* case, disputes between the owners of adjacent ahupuaas through whose lands the water ran in a natural channel to the sea.

In *H. C. & S. Co.* v. *Wailuku Sug. Co.,* 15 Haw. 675, the court said (p. 680) : "The waters in controversy may be divided into three classes: (1) those of the ordinary flow of the Wailuku stream; (2) those of ordinary (small) freshets, which come about once in ten days; and (3) storm waters (large freshets). These again may be divided into two classes: (a) surplus water, meaning thereby, as defined in 14 Haw. 61, the water, whether storm water or not, that is not covered by prescriptive rights and excluding also riparian rights, if there are any, and (b) water which is covered by prescriptive rights." The meaning of this language, so far as it refers to riparian rights, is made clear by the first clause of the syllabi, wherein it is said: "The surplus water of an ahupuaa, meaning thereby the water, whether storm water or not, that is not covered by prescriptive or riparian rights, is the property of the konohiki, to do with as he pleases, and is not appurtenant to any particular portion of the ahupuaa." I think it may be reasonably inferred from the foregoing language that the court intended to reserve for future discussion the very question that arose later in the

414

*Carter* case, otherwise the reference to "riparian rights" would appear to be without significance.

*Davis* v. *Afong*, 5 Haw. 216, also cited in the opinion written by the chief justice, was a water controversy between a number of owners of taro patches and the defendant, a Chinese, who was interrupting by drains and a pump the flow of water in certain ancient ditches which ran from springs located on the defendant's land upon lands which were owned by the plaintiffs and used for the cultivation of taro. In speaking of this case the court said, in *City Mill Co.* v. *Honolulu Sewer and Water Com.*, *supra* (p. 937) : "There was no similarity in the facts of that case to those of the case at bar. What the court decided in that case was, as stated by it in its own syllabus, that 'by the rules of ancient Hawaiian agriculture the taro patches of the konohiki are entitled to water from springs on the land.'" This characterization is correct. That is all that was decided in the *Davis* case except that prescriptive rights can be acquired in a spring of water that flows in an artificial channel. There was no question of surplus waters involved. Of course prescriptive rights can be acquired in anything and where an artificial channel is constructed from a spring the only rights that could be acquired therein adverse to the owner of the land where the spring is located would be prescriptive rights or rights by adverse use. They could never exist under the riparian rule.

So far as springs that have no natural outlet and do not form watercourses are concerned, the common-law rule is that they are owned by the owner of the land on which they arise. (3 Farnham, Water and Water Rights, Sec. 948, pp. 2738-2739.)

The court in the *Carter* case, evidently realizing that the question before it was not involved in any preceding case and therefore had not been decided, said that it was

one of first impression and should be determined according to the principles of the common law.

As I understand the opinion of the chief justice, one of the reasons given for thinking that the absolute ownership rule rather than the riparian rule should be applied in the instant case is that under the latter rule much of the water in question would be wasted because of the comparatively small area of Hanapepe lands to be irrigated, whereas under the former rule all of the water would be put to a beneficial use because of the larger area of the Makaweli lands. In other words, that because the benefits resulting to the Makaweli lands from using all the surplus water would be so much greater by comparison than the injury to the Hanapepe lands from not getting any of it the rule of absolute ownership should be applied.

Whatever may be said in favor of the economic reasons for applying the absolute ownership rule, as I view the law these reasons are legally insufficient. The true test of whether a rule should receive judicial sanction is not whether in its application it will benefit more people than it will injure but whether in its application it will deprive a single individual of a right to which he is entitled. Of course, if the riparian rule has never received sound judicial sanction in this Territory and the absolute ownership rule, even between the owners of adjoining ahupuaas, has been consistently applied, there are no riparian rights. I am not convinced, however, that this is the state of the law.

In *Peck* v. *Bailey,* 8 Haw. 658, the court said in its syllabus: "A riparian proprietor has a right, as an incident to his estate, to use the water for irrigation and domestic purposes, provided he does not materially diminish the supply of water or render useless its application by others; but his riparian rights are subject to the pre-

scriptive rights of others." This is a succinct statement of the riparian rule and is clearly a recognition of it. The riparian rule was also recognized in the *Carter* case and, as I have already observed, seems to have been in the mind of the court in *H. C. & S. Co.* v. *Wailuku Sugar Co., supra.* Furthermore, the waste of water suggested in the chief justice's opinion would, I believe, not follow even though the riparian rule should be applied in the instant case. If the diversion of the water to the Makaweli lands did not deprive the Hanapepe lands of water which they needed I am inclined to think that under the riparian rule the diversion would not be unlawful. If there was no injury to the Hanapepe lands by the diversion the proprietor of these lands would have no sufficient ground upon which to complain. In other words, if the Hanapepe lands received all the water they needed despite the diversion the diversion would be *damnum absque injuria.* In *Lonoaea* v. *Wailuku Sugar Co.,* 9 Haw. 651, the court said in its syllabus: "Water may be transferred from land to which it is an easement to land not entitled to it, providing no one is injured thereby." I believe this is the riparian rule. Speaking of the right to the use of waters, Kinney, in his work on Irrigation and Water Rights, says (Vol. 1, p. 842) : "All the common law authorities concur that, when the amount abstracted perceptibly or materially diminishes the quantity of the stream, so that injury results to those below, such a use of it by a riparian owner is unreasonable, and an infringement on the rights of other riparian owners, for which the law furnishes redress. Neither does necessity make any difference. As was said by Black, J., in Wheatley v. Chrisman: 'The necessities of one man's business can not be the standard of another's rights in a thing which belongs to both.'"

It is suggested in the chief justice's opinion that the application of the riparian rule to normal surplus water

would endanger the entire Hawaiian water system. The *Carter* case, which applied the riparian rule to the storm surplus water that flows through one ahupuaa into another, was decided in 1917. Since the water system of the islands, so far as I know, has not been injuriously affected by the *Carter* decision it would seem that the application of the riparian rule to normal surplus water as well, which, so far as the law is concerned, is on the same footing as storm surplus, would likewise be innocuous.

It is, I trust, not impertinent to notice in this connection that the instant suit was not brought by an individual to whom selfish motives might be attributed, but by the government itself, which is the guardian of the interests of all its citizens and is supposed to act at all times in accordance with their welfare.

What, after mature reflection, I cannot sanction is a rule of law that gives to the owner of an ahupuaa or an independent ili upon which flowing water originates such complete dominion over the water that he may at his will use or misuse it in such a manner as will work irreparable injury and discomfort to others who, but for such arbitrary control, would in the very course of nature have their necessities supplied. It seems to me that the rights of adjoining ahupuaas to the water that flows by natural channel through both of them are correlative, and, I think, the support given this view by the *Carter* case should not be withdrawn.

For the foregoing reasons I most respectfully dissent from the conclusion reached by the court that the decree appealed from should be affirmed.