Selwyn A. ROBINSON, Eleanor Robinson, Russell S. Robinson, Ruth R. Le Fiell, Marion R. Keat, Jean R. Weir, Selwyn A. Robinson, Eleanor Robinson, Bruce B. Robinson, Trustees under the Will of Aylmer F. Robinson, Helen M. Robinson, Individually and as Executrix, Estate of Lester B. Robinson, Bruce R. Robinson and Keith P. Robinson, Plaintiffs,

v.

George R. ARIYOSHI, Governor, Ronald Y. Amemiya, Attorney General, Andrew S.O. Lee, Deputy Attorney General, Wm. Y. Thompson, Stanley W. Hong, Larry E. Mehau, Manuel Moniz, Jr., Moses W. Kealoha and Takeo Yamamoto, Chairman and Members, Board of Land and Natural Resources, McBryde Sugar Co., Ltd., Olokele Sugar Co., Ltd., Ida Albarado, Helen B.H. Chu, Henry J. Chu, Chee Kung Fui Society, Lapaz Francisco, Marcellino Francisco, Albert K. Kaailau, Linda P. Kaiakapu, Ann N. Kali, Harriet U. Kano, Junichi Kano, Kiyoshi Kimata, Arnold W.F. Leong, Katherine A. Leong, Lo Sun D. Leong, Tai Hung Leong, Hanayo T. Naumu, Wallace A. Naumu, Hideo Nonaka, Masatoshi Nonaka, Shigekichi Nonaka, Takano Nonaka and Takao Nonaka (Small Owners), Defendants.

Civ. No. 74–32.

United States District Court,
D. Hawaii.

Nov. 25, 1987.

J. Garner Anthony, Alexander C. Marrack, Honolulu, Hawaii, for plaintiffs.

William F. Quinn, and John J. Rapp, Honolulu, for Olokele Sugar Co., Ltd.

J. Russell Cades, Philip J. Leas, Honolulu, for McBryde Sugar Co., Ltd.

Corrine K.A. Watanabe, Atty. Gen., Steven Michaels, Deputy Atty. Gen., and Paul D. Alston, Honolulu, Hawaii, for State Officials.

Robert B. Bunn, Honolulu, Hawaii, for Small Owners Ida Albarado, et al.

## DECISION ON REMAND

PENCE, Senior District Judge.

On June 23, 1986, the Supreme Court, in *Ariyoshi v. Robinson*, —— U.S. ——, 106 S.Ct. 3269, 91 L.Ed.2d 260, the case below being *Robinson v. Ariyoshi*, 753 F.2d 1468 (*"Robinson III"*), issued a memorandum decision:

> On Petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit. The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of *Williamson County Regional Planning Commission v. Hamilton Bank*, No. 84–4 (June 28, 1985).

It came to pass, therefore, that ten years after this judge had entered his decision in *Robinson v. Ariyoshi*, 441 F.Supp. 559 (D.Hawaii 1977) (*"Robinson I"*), the Court of Appeals for the Ninth Circuit sent to this court that same mandate, viz., "to reconsider its opinion in *Robinson v. Ariyoshi* in light of *Williamson County Regional Planning Commission v. Hamilton Bank*, [473 U.S. 172] 105 S.Ct. 3108 [87 L.Ed.2d 126]" (Williamson County).[1]

---

1. This case has been referred to by the parties as both "Williamson County" and "Hamilton Bank". Since the Solicitor General used the term "Williamson County", this court will adopt that title.

A review of the record and briefs filed with the Supreme Court shows that less than one month from the time The Court received the Solicitor General's brief, and only 14 days before the end of its 1985 term, it issued the above remand. This judge draws the conclusion that The Court, "caught in the end of the term crunch,"[2] and, having a high regard for all briefs filed by the Solicitor General of the United States, simply followed the Solicitor General's recommendation[3] that "the petition for a writ of certiorari should be granted, the judgment of the court of appeals vacated, and the case remanded to the court of appeals for further consideration in light of *Williamson County Regional Planning Commission v. Hamilton Bank*," opting not to decide the case at that time, and thus postponing, indefinitely, the time-consuming effort involved in the ultimate disposition of the case.

Since, as indicated, this judge has concluded that it was the brief of the Solicitor General and his uncritical assumption of "unripeness" of this case which triggered The Court's granting certiorari and remand, therefore, this judge in this decision will primarily address the position taken by the Solicitor General in his Amicus Brief.

The basic facts underlying the conclusion of dissenting State Justices Marumoto and Levinson, that the three-judge majority had taken the property of the plaintiffs without due process and without compensation in violation of their constitutional rights, were fully set out in 1973 in *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 504 P.2d 1330 ("*McBryde I*") and *McBryde Sugar Co. v. Robinson*, 55 Haw. 260, 517 P.2d 26 ("*McBryde II*"), and further complemented by this court's decision in *Robinson I*. If any further review of the basic facts are felt necessary, the same are supplied by the Court of Appeals for the Ninth Circuit in *Robinson v. Ariyoshi*, 753 F.2d 1468 ("*Robinson III*").

Every one of the above-indicated Justices of the State Supreme Court and United States judges were fully convinced that the plaintiffs' equal protection and due process claims were ripe for decision, and that the State Supreme Court, in *McBryde I and II*, had issued a final decision taking away the plaintiffs' vested water rights.

It was not until the Solicitor General filed his brief in *Ariyoshi v. Robinson*, 474 U.S. 1018, 106 S.Ct. 565, 88 L.Ed.2d 550, that any of the preceding judges were aware that there was even a possibility of "unripeness" in the plaintiffs' claims. If it were not for the Solicitor General's finding, in the Answers of Robinson II, justification for his conclusion that the rulings of *McBryde I* and *II* were not final—that Hawaii's law regarding surplus water was unsettled prior to McBryde, that plaintiffs had not exhausted remedies available in the state courts, and that this case was not yet "ripe" for conclusion—this decision would be at least 40 pages shorter. Much of what is set forth hereafter is to be found in the prior decisions and opinions in the long and extensive record of this case. This judge does but repeat herein much that has been said before by him and other justices and judges in the hope that it may simplify the task of review for those judges and justices who will hear this case hereafter in determining if any light whatsoever is shed thereon by *Williamson County* or *MacDonald Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) ("Yolo County").

### FINDINGS OF FACT

#### I.

The case now before this court stems from *Territory v. Gay*, 25 Haw. 651 (1920), 26 Haw. 382 (1922) ("*Gay I*"), and *Territory v. Gay*, 31 Haw. 376 (1930), 52 F.2d 356 (9th Cir.1931), *cert. denied* 284 U.S. 677, 52 S.Ct. 131, 76 L.Ed. 572 (1931) ("*Gay II*"). *Gay II* determined the rights of Gay (now Gay and Robinson (G & R)) to the water originating in the ilis kupono of Koula and

---

**2.** Justice O'Connor, at the Ninth Circuit Judicial Conference, August 20, 1987.

**3.** Solicitor General's Brief, p. 20.

Manuahi, both of which ilis are in the ahupuaa of Hanapepe.[4]

In *Gay I*, the Territory (now the State) challenged the ownership by G & R of a major portion of the land of Koula. The Supreme Court of the Territory (now the State Supreme Court) determined the entire land of Koula to be an ili kupono belonging to G & R. Neither the Territory nor the State has ever challenged the title of G & R to the ili kupono of Manuahi. Under all prior decisions of the Supreme Court of Hawaii—be it of the Kingdom, Republic, Territory, or a State—the daily surplus water of a stream having its source in an ahupuaa belonged to the konohiki of the ahupuaa or ili kupono, to do with as he pleased.

In *Gay II*, the Territory, as konohiki of the ahupuaa of Hanapepe, alleged in its Complaint that it was entitled to all the surplus waters of the Hanapepe River and its tributaries. The Koula Stream was a tributary. As to "surplus waters," Justice Perry stated:

> ... [T]he parties are agreed that there is normally a surplus of water flowing in the stream over and above the quantity required to satisfy the needs of certain lower kuleanas and other lands in the ahupuaa of Hanapepe which have become entitled to water by prescription or to which water rights were appurtenant at the time when the land commission awards [the Great Mahele] were made. They are agreed that this suit is not intended to settle conflicts, if there are any, between the respondents and the owners of the kuleanas or other lower lands entitled to water by prescription or by appurtenance and that the decision of this court will relate only to the surplus of water not required for such lower prescriptive or appurtenant rights.[5]

Thus the Court's opinion concerned itself, primarily, with *daily* surplus water. *Gay II* went on to confirm the decision of the trial court that G & R were the owners of and had a right to divert the daily surplus waters from the valley of Koula by means of dams, ditches, and pipelines to the arid lands of Makaweli on the Island of Kauai. The opinion of the Territorial Supreme Court, in turn, was affirmed by the Court of Appeals for the Ninth Circuit in *Territory of Hawaii v. Gay*, 52 F.2d 356.

*Gay II* established that (1) G & R *owned* the normal daily surplus waters of Koula and Manuahi Streams, and (2) G & R had the *right* to divert such surplus waters to areas outside the Hanapepe watershed.

## II.

There is no question but that after 1931, all of the parties to this case—the State (Territory), G & R, Olokele as the lessee of some of its water rights, McBryde, and the small owners—each and all had *vested* property rights to and in the waters of the Hanapepe River and its tributaries.

G & R had been diverting waters to arid lands out of the Hanapepe watersheds since 1891 by means of dams and ditches. McBryde, as owner of ilis kupono of Eleele and Kuiloa, situated in a lower corner of the valley, also diverted large quantities of water from the Hanapepe River. In 1949, G & R greatly improved the dam, ditch, and tunnel system for diverting the Hanapepe water to Makaweli (out of the Hanapepe watershed)—a substantial portion of which is cultivated by Olokele. These diversions decreased the amount of water going to the downstream owners of appurtenant and prescriptive water rights, i.e., particularly McBryde, but also the State and the small owners.[6]

---

4. For a complete discussion of the rights of owners of ilis kupono vis-a-vis the owner of an ahupuaa, and appurtenant and prescriptive rights, see *Gay II*, 31 Haw. 376, 383–388.

5. *Gay II*, 31 Haw. 382.

6. The small owners are either owners of land having appurtenant water rights, or purchasers of such rights. They and their predecessors in title once used the river waters to irrigate taro lands. Prior to *McBryde II*, those water rights were vested property rights which included the right to transfer ownership away from the taro lands and to divert and use that water on other lands. As indicated, some of the small owners own water rights severed from lands.

In 1956, McBryde sued the Territory, G & R, and the small owners to secure at least the water it had been using before G & R improved its system, and a determination of the exact quantity to which it was entitled.[7] The case did not come to trial until May 5, 1965 (after Hawaii had become a State). Trial lasted over three months. The record before the Supreme Court contained the 3,483 pages of testimony, plus voluminous documentary exhibits. The underlying vested *rights* of the several parties, including the small owners, to take and use the waters of the stream *were acknowledged by the parties*, themselves, in the controversy. The only issues involved the quantity of waters, be it normal, daily surplus, storm or freshet to which each was entitled.[8] That trial, although statutorily nominated as being before the "water commissioner", was, in fact, before the circuit judge of the Fifth Circuit of the Territory of Hawaii, from which court, of course, there was then a direct appeal to the Territorial (now State) Supreme Court.

As stated by Justice Marumoto, in dissent, in *McBryde I, supra*, pp. 204–5, 504 P.2d 1330,

> The issues in this case, raised and tried in the circuit court, were: (1) the quantity of water of Koula Stream and Manuahi Stream to which McBryde is entitled as appurtenant to its lands in the Hanapepe valley; (2) the quantity of such water to which the State is entitled as appurtenant to its lands in the valley; (3) the quantity of such water to which other owners of lands in the valley are entitled as appurtenant to their lands; (4) the quantity of such water which McBryde is entitled to take under a claim of prescriptive right; and (5) the right of G & R, the State, McBryde, and other owners of lands in the valley to the storm and freshet water of Koula Stream and Manuahi Stream. Those also were the issues, and the only issues, presented and

argued to this court on the present appeal.

The trial court first determined the number of acres owned by the respective parties which had been under taro cultivation at the time of the land commission award, *from time immemorial*, and thus entitled to appurtenant water rights. Next, the court determined the average quantity of water used per acre per day in growing taro—50,050 gallons. The court then "found that as appurtenant rights, McBryde was entitled to 4,915,400 gallons per day, the State, 4,167,650 gallons, G & R [below Koula and Manuahi] 1,533,050, and the other landowners, collectively, 1,456,950." The trial court also concluded that McBryde, by adverse use, "had acquired prescriptive rights to 2,084,600 gallons and thereby McBryde could divert 7,000,000 gallons of water per day...." Since prescriptive rights could not run against the State, "the amount of prescriptive right to water [was] deducted from or charged against the water rights of Gay and Robinson."[9]

Contrary to the inferences used by the Solicitor General, the trial before the water commissioner was *not* a hearing before any type of regulatory agency. As indicated, the water commissioner in Hawaii is always a circuit judge, and the proceedings before a water commissioner are strictly and solely a judicial trial with appeal therefrom to the Supreme Court.[10] As carefully delineated by Justice Marumoto, the water commissioner, recognizing the rights of the parties to its waters and its use, simply determined the *quantity* of water to which each party was legally entitled, appurtenant or prescriptive, as an adjunct to and a part of the rights inherent with the ownership of ancient taro lands and the prescriptive rights of McBryde in the surplus wa-

---

7. The history of the instant litigation is more fully detailed by Judge Levinson in *McBryde II*, 55 Haw. pp. 263–266, 517 P.2d 26.

8. *McBryde Sugar Co. v. Robinson*, SP #108, Fifth Circuit Court of Hawaii, December 10, 1968.

9. *McBryde I*, 54 Haw. p. 177, 504 P.2d 1330.

10. The Solicitor General gives but lip service to this conclusion in his Brief, p. 11, n. 4.

ters.[11]

From the decision of the circuit judge, the small owners did not appeal. They were satisfied with the 50,050 gallons-of-water-per-acre-per-day entitlement. Each knew that under the law he had the right to use the water any place he chose, or to transfer that same right to someone else separate and apart from the land to which it was appurtenant. Some of the small owners, as well as G & R and McBryde, had already bought water rights severed from the ancient taro land. Olokele did not appeal, since it got its water from G & R. McBryde, G & R, and the State—all appealed, G & R believing that McBryde, under its claim of prescriptive rights, had been allocated too much surplus water out of G & R's share; the State claiming that it had not been allowed enough water out of the stream, and McBryde, likewise, claiming that it had not been granted its full share of appurtenant and prescriptive water. McBryde and the State appealed the trial court's finding that G & R was entitled to *all* of the storm and freshet waters of Koula and Manuahi Streams. The *only* issues tried and adjudged was the *quantity* of *water* to which each of the parties was entitled as of vested right.

The State Supreme Court affirmed the trial court's findings as to issues 1, 2, and 3, *supra*.[12] As to issues 4 and 5, the Supreme Court then held that all waters in all streams in Hawaii, be they normal, surplus, storm or freshet belonged to the State! Therefore, McBryde was entitled to take nothing under its claim of prescriptive right, and G & R, McBryde, and the other owners of lands along streams had no rights in the storm and freshet waters. The Supreme Court also held that as between the State, McBryde, G & R (and, by necessary inclusion, all other parties having either or both riparian or appurtenant water rights) have no property *rights* in

the water itself. The court also held that the commonlaw doctrine of riparian rights was the law in Hawaii. Thus the owners of land adjoining a natural watercourse had appurtenant riparian rights to water in connection with their riparian lands, i.e., they had only a right to divert water from the stream onto their riparian lands and then return it to the stream, so that the flow of the stream would remain in the shape and size given it by nature. Finally, the Court held that neither McBryde nor G & R had any right to divert water out of Hanapepe Valley into any other watershed (and thus, inclusively, the small owners also had no right to divert water out of the watershed).

As developed in the dissent of Justice Marumoto to *McBryde I* and even more fully, carefully, scholarly, and exhaustingly analyzed by Justice Levinson in his dissent in *McBryde II*, and further, exhaustively and scathingly analyzed and denounced by this judge, the State Supreme Court, without notice or warning of its intent to do so to any of the parties—appellants or respondents—went beyond the issues before it on appeal, *sua sponte*, overruled all prior water rights cases decided by the Supreme Court of the Kingdom, the Republic, and the Territory of Hawaii to the contrary, and adopted the English commonlaw doctrine of riparian rights. Also, it held, *sua sponte*, that there was no such legal category as "normal daily surplus water". It also declared that the State, as Sovereign, owned and, subject only to riparian rights, had the exclusive right to control all the waters of the Hanapepe River; thus, McBryde had no *prescriptive right* to take any water from the stream.

There was nothing unripe or non-final about the Supreme Court's holdings in *McBryde I*. Its holdings, of course, brought Olokele and the small owners—parties who had not appealed—joining with

---

**11.** The adjudication that ancient taro lands had water rights was not dependent upon any use or continuity with hostility for any period of time, but merely followed from the fact that just prior to the grant of awards under the Great Mahele, water was being used on those lands presumably by right. If any lands were entitled to water by immemorial usage, that right was in-

cluded in a conveyance from the King as an appurtenance. Any grantee of a taro land held all that was conveyed to him, including water courses and all water which the lands had enjoyed. *See Gay II, supra,* 31 Haw. pp. 385–6.

**12.** As stated by Justice Marumoto, *supra*.

McBryde and G & R in applying for a rehearing. The State Supreme Court allowed a rehearing only on the limited issue of the proper construction of H.R.S. § 7-1 (a century-old statute dealing largely with drinking water and rights-of-way on roads over private lands and the meaning of the word "appurtenant"). The Supreme Court summarily refused to allow the affected parties to enlarge the scope of the rehearing to include state and federal constitutional claims.[13]

*McBryde II* left nothing unripe or non-final. G & R, McBryde, Olokele, the small owners—each and all had lost all of their vested property rights to take water from the Hanapepe River, had lost the right to sell and exchange the same, and had lost the right to divert water out of the Hanapepe watershed into adjoining arid lands.

The Supreme Court had given the State all of the water in the river. Thus, the decision of the Court of Appeals, in *Gay II*—that G & R were the owners of the normal surplus water flowing from their ilis of Koula and Manuahi into the Hanapepe River and had a right to divert that water outside of the Hanapepe watershed—was summarily and tacitly held for naught and overruled. The doctrine of res judicata as between the State and G & R was also, actually, held for naught.

### INITIAL POSITION OF STATE ON FINALITY

The State itself was saying, on 12/29/69 in its opening Brief on appeal from the *circuit* court's decision, pp. 25-26: "As held by this court [in *Gay II*], G & R, as the owner of the ili of Koula is entitled to the normal daily surplus water of the Hanapepe River." In its answering Brief to the opening Brief of McBryde, before *McBryde I*, on p. 5, the State, on 6/1/70, stated, "The State agrees with McBryde's argument that *Carter v. Territory*, 24 Haw. 47, should have been adhered to by the trial court. Storm and freshet waters should have been apportioned among the konohikis of Hanapepe."

In its opening Brief of 12/29/69 before the *McBryde I* ruling, *supra*, the State said, on p. 8: "Storm and freshet surplus waters should be divided proportionately among the wet [taro] landowners." Then, on p. 63,

> "All water in excess of 50,000 gallons per day [i.e., the daily amount of *appurtenant* water allowed per acre of ancient taro lands] should have been found by the court to represent storm and freshet surplus water which is to be apportioned among the *owners of water rights* in proportion to the total wet [taro] land holdings [emphasis added]."

On p. 13 of its trial Brief of 3/31/76 before this court, the State said, "In the case at bar, the State court, in *McBryde*, made a definitive ruling on vested water rights." On p. 14, the State said, "[*McBryde I*] settled the question of surplus water rights, be it normal surplus, storm and freshet by declaring it to be owned by the State." On p. 16, the State said, "*McBryde* ... overruled the law of prescriptive water rights...."

In its opening brief before the Ninth Circuit, the State said, "[*McBryde* decided] (1) that the water rights of the [plaintiffs] can only be utilized in Hanapepe Valley and cannot be taken out of the valley to water non-wet lands or kula lands; (2) that all surplus water, normal and storm and freshet, was owned by the State; and (3) in view of the ownership of surplus water by the State, the question of prescriptive water rights was moot, hence, prescriptive water rights allotted to McBryde by the lower court was overruled."

The State, on its Motion to Dismiss Plaintiffs' Complaint before this court, *supra*, on p. 1, stated, "The Hawaii Supreme Court decision [*McBryde*] authoritatively <u>determined the water rights</u> of the parties who are owners of the land in the Hanapepe Valley of Kauai," and on pp. 10-11, stated, "Plaintiffs' complaint herein [before this court] clearly reveals this action is subject to the affirmative defense of res judicata under Rule 8(c) ... [T]he [*McBryde I* and *II*] court adjudicated the water rights of

13. *See Robinson I,* 441 F.Supp. 559, 564, and  *McBryde II.*

the parties in the Hanapepe Valley." (Underscoring added.)

On p. 13, "[T]he Supreme Court of the State of Hawaii has rendered a <u>final</u> decision upon the merits with regard to the water rights of the parties in its decision in *McBryde*." (Underscoring added.) On p. 14, "In essence the Plaintiffs are attempting to relitigate the water rights issues which were settled by the Hawaii Supreme Court in its *McBryde* decision, *supra*." On p. 20, "Since these rights have been determined by the Hawaii Supreme Court in the *McBryde* case, *supra*, Plaintiffs' action should be dismissed."

In its Answers to the cross-claim of McBryde Sugar Co., Ltd., p. 2, on 9/16/74, the State said, "McBryde is estopped or barred by the doctrine of res judicata and collateral estoppel from asserting the claims alleged in the Cross-claim."

On p. 1 of its Answer to the plaintiffs' Complaint in this court on 9/16/74, the State said, "Plaintiff is estopped or barred by the doctrine of res judicata and collateral estoppel from asserting the claims alleged in the Complaint."

On 12/3/74, in its Answer to Cross-claim of Ida Albarado, et al. (small owners), p. 2., the State said, "Small owners are estopped by the doctrine of res judicata and collateral estoppel from asserting the claims alleged in the Cross-Claim."

As above indicated, before the Solicitor General filed his Brief, the State conceded that there was nothing unripe after *McBryde I* and *II*. *All prior vested rights had been judicially taken* from G & R, Olokele, McBryde, and the small owners and given to the State.

## INITIAL POSITION OF CHIEF JUSTICE RICHARDSON

On 10/2/78 in the "Brief of Amicus Curiae, Williams S. Richardson, Chief Justice of the Hawaii Supreme Court," to the Court of Appeals for the Ninth Circuit, Special Deputy Attorney General and attorney for the Chief Justice, Chang, on p. 21, stated, "Quite obviously, if *Robinson v. Ariyoshi* had been filed in State rather than federal court, the Supreme Court of Hawaii would have *barred the action on the basis of res judicata*" (emphasis added).

On 12/29/78, in the Reply Brief of State Officers, on p. 6, it is stated, "At this point [following denial of the petition for certiorari in 1974], litigation should have ended."

On 12/31/78 in the Addendum to Reply Brief, Attorney Chang, on p. 14, stated: "The Court Below [this district court] Was Compelled To Apply Res Judicata."

On 10/3/83 in the Memorandum by Appellants on the Effect of Hawaii Supreme Court's Opinion of December, 1982 on the instant case, and in the Answers to the Certified Questions, pp. 3–4, the State said:

3. All surplus water, including normal surplus water as well as storm and freshet surplus water, awarded to Gay and Robinson (G & R) (Appellee) by the trial court was reversed in *McBryde*, and all surplus water—normal daily surplus, storm and freshet surplus *and appurtenant water awarded but not used*, was the property of the State of Hawaii....

4. Prescriptive water rights awarded in McBryde Sugar Company by the trial court sitting as a Water Commissioner was reversed in *McBryde* on the basis that since the State was the owner of all surplus water and the statute of limitation does not run against the State, prescriptive rights became moot.

The foregoing issues are *final*. There can be no confusion or misunderstanding on said issues by Appellees. Res judicata, collateral estoppel, merger and bar would preclude said issues in future litigation. (Emphasis added.)

From each and all of the above, it is only by deliberate or blurred visual distortion that anyone, including the Solicitor General, could find that there was anything unripe or non-final about the majority's holding in *McBryde II*.

## IN THE COURT OF APPEAL

When this case left this court in 1977, the only issues that were referred by this court back to the *state trial court* were the problems of (1) the prescriptive rights of

McBryde; (2) who was entitled to the storm and freshet waters (McBryde had appurtenant rights to the waters as did all of the small owners—either by ownership of appurtenant lands or by purchase of water rights from those having appurtenant lands). The "final" determination by the State Supreme Court in *McBryde I,* viz., that neither G & R, McBryde, Olokele, and the small owners had any property rights in the waters and that none of those owners could transport water to another watershed; that none of the affected parties had any rights to "normal daily surplus" water; that mcBryde had no prescriptive right to water, and that all water in the stream belonged to the State and thus, also, all storm and freshet waters belonged to the State, were held to have been an unconstitutional taking by this court. There was nothing unfinal or unripe in the posture of any basic aspects of the case when the case went to the Court of Appeals.

As stated by the Court of Appeals [14], "the interest affected by *McBryde I* and *II* included (1) the *water rights* which as *private property* had been bought, sold, and leased freely and which had been the subject of local and state taxation as well as of condemnation for both water and ditch rights-of-way; (2) the expenditures by G & R and Olokele of almost one million dollars in building an extensive water transportation system for irrigation of their sugar lands, lands now potentially destined to become pasture; and (3) the interest of McBryde Sugar Company which stands, if its rights are vested, in the same position as Gay and Robinson".

Thereafter, this litigation produced three oral arguments in the Court of Appeals, after the first two of which the Court of Appeals referred certain certified questions to the Supreme Court of Hawaii, which are set out and responded to in *Robinson v. Ariyoshi,* 65 Haw. 641, 658 P.2d 287 (1982) (*Robinson II* ). After the Court of Appeals received the State court's Answers to the certified questions, the parties briefed the remaining issues that had been narrowed

by the earlier proceedings and reargued the case.

In its subsequent opinion, the Ninth Circuit Court of Appeals said,

"The substantive question ... is whether the State can declare by court decision that the water rights in this case have not vested. The answer is no. [The Supreme Court of Hawaii's] declaration of a change in the water law of Hawaii may be effective with respect to real property rights created in Hawaii after the *McBryde I* decision became final. New law, however, cannot divest rights that were vested before the court announced the new law ... The judgment of the district court is affirmed in all respects insofar as it declares the rights of the parties." [15]

Thereafter followed the petition for certiorari filed by the State, the Amicus Brief of the Solicitor General, and The Court's remand.

## SOLICITOR GENERAL'S BRIEF

### A. FINALITY

All of the preceding facts were superficially reviewed by the Solicitor General in his Brief, pp. 2–6. Yet, the Solicitor General said, regarding finality of the case at that time in 1974: *"It might have appeared* that the finality requirement of *Williamson County* was satisfied" (emphasis added). There was no qualification in its "appearance" of finality from either Justice Marumoto, Justice Levinson, from this judge, or the judges of the Court of appeals, nor initially from the State or Chief Justice Richardson.

One is led to infer that the Solicitor General never read the dissents of Justice Marumoto, the "scholarly dissent of Levinson, J., whose historical research provides valuable background and whose reasoning was followed by the district court" [16], nor this court's decision in *Robinson I.* Both Jus-

---

14. *Robinson III, supra,* 753 F.2d 1468, 1473.

15. *Robinson III, supra,* 753 F.2d 1468, 1473.

16. *Robinson III, supra,* 733 F.2d 1468, 1471, n. 2.

tice Levinson and this judge fully and clearly demonstrated that from prehistoric times in Hawaii, the Hawaiians had developed canals diverting waters out of the watersheds and away from the riparian lands to irrigate their crops. The right of a konohiki of an ahupuaa or an ili kupono was to control, absolutely, the use of the surplus water originating on his land, with the power to divert water to kula (dry) lands outside the watershed.[17] After the Great Mahele, when large-scale sugar cultivation demanded more water for irrigation, particularly in sugar lands in relatively arid locales, costly and elaborate new irrigation systems were constructed. The common-law doctrine of riparianism did not apply in Hawaii.[18]

As hereinabove noted, beginning with *Peck v. Bailey* in 1867, 8 Haw. 658, and continuing with *Lonoaea v. Wailuku Sugar Co.*, 9 Haw. 651 (1895), *Horner v. Kumuliili*, 10 Haw. 174 (1895), *Wong Leong v. Irwin*, 10 Haw. 265 (1896), *Palolo Land and Improvement Co. v. Wong Quai*, 15 Haw. 554 (1903), *Foster v. Waiahole Water Co.*, 25 Haw. 726, 733–35 (1921), and *Territory v. Gay*, 31 Haw. 376 (1930), the Hawaiian decisions held that the owner of land with the appurtenant or prescriptive right to water could transfer that water to any other land, whether in the same or another watershed, so long as the water *rights* of others were not thereby compromised. Directly relative to the instant case, *Gay II* held that the konohiki of an ahupuaa or ili kupono upon which normal surplus water arose could transport it wherever he wished, including to kula land in an entirely different watershed.

One has but to read those recognized authorities on Hawaiian history and Hawaiian water rights, viz., R. Kuykendall, *The Hawaiian Kingdom*, Chapter XV, 1938; R. Kuykendall and A. Day, *Hawaii: A History*, 1948; E.S. Handy and E.G. Handy, *Native Planters in Old Hawaii*, 56–67, 1972; H.A. Wadsworth, *A Historical Summary of Irrigation in Hawaii*, 37 The Hawaiian Planters Record 124, 1933; 4 Honolulu Water Commission Records 169, 1908; C.R. Hemmingway, Attorney General, *A Statement Regarding the Laws of Waters and Water Rights in Hawaii as Existing in Relation to Fresh Waters*; A. Perry, *A Brief History of Hawaiian Water Rights*, 1912; and The Water Commission Report of January 13, 1917, to know that in 1973 it was solid, affirmed and reaffirmed law in Hawaii that the common-law doctrine of riparianism was not the law of Hawaii; that the State did not own all of the water, but, rather, that the owner of the lands along the streams had vested rights in the water, according to the number of acres of taro lands anciently using that water; that the konohiki had the right to take the normal surplus waters of a stream and use it where and as he wished, that water could freely be diverted out of the watershed, and that water rights could be freely bought and sold.

*McBryde I* and *II* clearly and unequivocally declared all such laws invalid and gave all of the waters in the stream, whether normal surplus, storm and freshet to the State, and declared that the water could not be diverted out of the watershed. As determined by Justice Marumoto, Justice Levinson, and this court (and the court of appeals), such action on the part of the State Supreme Court constituted a final and unconstitutional taking—and in this case, without due process.

The Solicitor General clearly could not have read the above authorities on Hawaiian water law. Under the above authorities, the action of the Court, in *McBryde I*, was unquestionably "an unpredictable change in State law".[19]

## B. THE "UNCLEAR LAW" ON SURPLUS WATER

After giving niggardly recognition to the "appearance" of judicial finality of

---

17. *McBryde II*, 55 Haw. at 292, 517 P.2d 26.

18. *Id.*, p. 294, 517 P.2d 26.

19. *Hughes v. Washington*, 389 U.S. 290, 296, 297, 88 S.Ct. 438, 442, 442, 19 L.Ed.2d 530 (1967).

*McBryde I* and *II*[20], the Solicitor General continued:

3.a.  The Answers to the certified questions rendered by the Hawaii Supreme Court in 1982, however, dispelled whatever air of finality had surrounded the decision in *McBryde*.  Those Answers in the form of a published opinion [21] [Robinson II] ... must be regarded as the dispositive exposition of the meaning and consequences of the *McBryde* decision as a matter of state law.[22]

The Solicitor General thereafter accuses the court of appeals of failing

... to appreciate their significance to the "taking" inquiry and, instead, essentially ignored them ... [T]he court of appeals failed to mention, much less rebut, the Hawaii Supreme Court's explanation, given in direct response to one of the court of appeals' questions, that the law of Hawaii with regard to the ownership of surplus water was unclear prior to *McBryde* ... [T]he court of appeals nevertheless held that respondents had "vested" rights based on state law prior to *McBryde*.

When the Solicitor General made that accusation, unfortunately he did not know that there were two categories of "surplus" waters: (1) daily normal surplus, and (2) storm and freshet surplus.  As shown hereafter, the law regarding normal surplus was settled; that of storm and freshet surplus was not completely so.  The Hawaii Supreme Court, by combining the two under "surplus", made a deliberately misleading statement.

Nowhere in its Answers to the questions did the Richardson Court indicate any unresolved legal problem remaining out of *McBryde I* and *II*, which would be tried in the circuit courts.  There was no remainder in the *McBryde* case "permitting a continuation of the case at the trial level," [23] nor could either the Richardson Court or the Solicitor General specify any unresolved

problems left for the decision of the trial court.

Inasmuch as the court of appeals reviewed the problems in this case on three separate occasions before its opinion in *Robinson III*, when all of the facts of this case and the above citations of case law and authorities on water rights were argued and reargued by all of the parties, it is impossible for this judge to understand how the Solicitor General could make such a gross accusation that the "court of appeals failed to appreciate" the significance of the "Answers" to the taking inquiry and "essentially ignored them".  The Solicitor General maintains that the "court of appeals failed even to mention, much less rebut, the Hawaii Supreme Court's explanation ... that the law of Hawaii with regard to the ownership of surplus water was unclear prior to *McBryde*."

The above statement was an insult to the intelligence and integrity of the panel of the Ninth Circuit Court of Appeals.  It was that circuit which, in *deference* to the state court, had asked the questions.  The panel had before it all of the evidence and information which this court has heretofore reviewed regarding Hawaii's water laws. The panel had the benefit of full argument on the Answers by plaintiffs, the State, and Justice Richardson's own personal lawyer. That panel could not have ignored the Answers, nor failed to appreciate the significance of the Answers to the taking inquiry. That it did not mention or rebut the Hawaii Supreme Court's explanations does but indicate the opinion of the panel as to the weight which should have been given to those verbose and evasive Answers.  The court of appeals did not "freely impose [its] own views on the content of [Hawaii's] property law."  It could not have reached its opinion in *Robinson III* without having considered "whether [or not] the state court's pronouncements were 'reasonable'," and "whether [or not] the state court's decision [had] 'fair support' or a

---

20.  Solicitor General's Amicus Brief p. 12, para. 2.

21.  65 Haw. 641, 658 P.2d 287.

22.  *Id.*

23.  Solicitor General's Brief, p. 15.

'fair and substantial basis'." [24] To infer otherwise, as did the Solicitor General, would not only negate the appellate court's rationale for asking questions of the Richardson Court, but also imply that it did not study and evaluate the Answers to those questions.

In discussing the application of the decree in *Territory v. Gay* (*Gay II*) and the construction of diversion works and basic use of water by G & R, the Solicitor General stated, "In our view, this formulation of circumstances in which a taking of respondents' asserted rights in water would occur is too simplistic, at least without a much firmer foundation in the law of Hawaii than is exhibited by the court's opinion." [25] After acknowledging that a judgment of a court may vest a property right under a governing law, and citing *Nevada v. United States*, 463 U.S. 110, 130–134, 138–141, 103 S.Ct. 2906, 2918–20, 2922–23, 77 L.Ed. 2d 509 (1983), the Solicitor General continues: "However, [*Gay II*] was not a general adjudication of all rights to the waters of the Hanapepe River, and it did not even *quantify* the respective rights of the Territory and G & R." Again recognizing that the building of diversion works and beneficial application of water may indicate "vesting", under *Nevada v. United States, supra,* the Solicitor General continued, "Those events are not necessarily determinative of the particular water rights claimed in this case, which are based in large measure on the mere ownership of certain land (ancient taro lands and ilis kupono)."

It is clear from the above statement that the Solicitor General completely ignored all of the case law on water rights in Hawaii prior to *McBryde*.

As indicated, all of the above authorities, without exception, hold that the law in Hawaii as regards to daily surplus waters was crystal clear prior to *McBryde I*. As indicated above, the only area in which there might possibly have been some slight murkiness was the law regarding storm and freshet waters. The court of appeals did *not*, as inferred by the Solicitor General in his note 5 on p. 13, "freely impose [its] own views on the content of state property law." Contrary to the Solicitor General's conclusion, there was no "fair support" or a "fair and substantial basis" for the self-serving statements in *Robinson II*'s Answers.

### ROBINSON II'S ANSWERS

Here follows the questions of the court of appeals, the Answers of the State Supreme Court thereto, and this court's analysis of those Answers "in light of" the interpretation given them by the Solicitor General.

1. May any Hawaii state officials execute on the judgment entered in *McBryde Sugar Co. v. Robinson, supra,* to enjoin Robinson, McBryde, Olokele, or the Small Owners from diverting water from the Hanapepe or Koula watersheds?

Without directly answering the question, the Richardson Court ("R. Court") said that when *McBryde I* held that "the *right* to the use of water . . . may only be used on connection with the . . . land to which the right is appurtenant," and neither McBryde nor Gay and Robinson has any right to divert water from the Koula Stream and Hanapepe River in Hanapepe Valley into other watersheds, the court did not thereby "enjoin or explicitly prohibit diversion." . . . "We sought only to establish that these private usufructory interests [do not] include any inherent enforceable right to transmit water . . . ." Finally, more directed to the question, the court stated that the enforcement of "these limitations" *is* available to appropriate parties, including the State.

---

**24.** Solicitor General's Brief, p. 13, n. 5.

**25.** Solicitor General's Brief, n. 6.

*This Court's Analysis:*

Stripped of all its prolix verbiage, the Richardson Court again said that the State owns all the water, the plaintiffs have no right to surplus water, none of the plaintiffs may divert water out of the watersheds, and if any of the plaintiffs at any time illegally attempt to so divert water, the State can prohibit any such diversion.

An example of verbal evasiveness is clearly illustrated in the Court's response regarding diversion. Although the Court flatly declared, in *McBryde I,* 54 Haw. p. 200, 504 P.2d 1330, "Neither McBryde nor Gay and Robinson has any right to divert water ... out of the Hanapepe Valley into other watersheds," in *Robinson II, supra,* 65 Haw. p. 648, 658 P.2d 287, that same Court said, "We did not say that such transfers are prohibited as a matter of law, for *McBryde* did not discuss and therefore cannot be understood to be conclusive of the circumstances under which a private party or the State could obtain injunctive relief against unsanctioned transfers." And the Court continues on in the same evasive vein. That issue was never raised in the trial court. Of course *McBryde* didn't discuss "unsanctioned transfers". *McBryde* made any such transfer *unlawful,* per se!

2. May the State of Hawaii claim collateral estoppel or bar and merger effect from *McBryde Sugar Co. v. Robinson, supra,* if the State brings an action either to quiet title to the water of the Hanapepe or to enjoin the diversion of water from the Hanapepe?

(a) The R. Court held that it is not possible to bring an action to quiet title to water rights because under H.R.S. 669-1(a) (1976) water rights did not constitute an estate or an interest in real property, stating, "Since such enactment, we have never sanctioned the use of the statute to quiet title to water, per se, although it may be used to quiet title to real property with appurtenant or riparian rights." The court stated that the *McBryde* case before the trial court was simply an "action to determine the rights of the parties to the waters of the Hanapepe." The trial court's judgment identified the quantity of water each party was entitled to through appurtenant, prescriptive, and surplus water rights. This court affirmed in part the award of appurtenant water rights, but reversed the trial court's award of prescriptive and surplus waters. The R. Court "confirmed the existence of riparian rights, delineated limitations on the right to transport appurtenant and riparian waters, and found that the State was the owner of surplus water. But no specific instruction was imparted to the trial court, and this court did not utilize its power to render a final judgment." [26]

(b) The court then stated that there was no bar or merger because the *McBryde I* decision was not a "final judgment". Nevertheless, the lower Hawaii courts would be required to treat *McBryde I* as "law of the case."

---

26. *Robinson II,* 65 Haw. p. 652, 658 P.2d 287.

*This Court's Analysis:*

2a. Although water rights had been taxed, condemned for public purpose, bought, sold, and transferred as property rights, i.e., treated as real property for over a hundred years, the Court was deliberately misleading with its words without giving the true answer in stating, "We have never sanctioned their use of the statute to quiet title to water, per se." The Court could not honestly say that such an action could not be brought. With the land granted by the King, *all* the appurtenants came with it.[27]

2b. Although the Court stated that its judgment was not final, because it had "affirmed in part and reversed in part," factually the Court remanded nothing to the trial court. There was nothing to remand. The Court had given all the water to the State, subject only to the riparian rights of owners of the ripa, i.e., 50,050 gallons of water per acre of ancient taro lands. The Court had given all waters to the State; it had taken away all prescriptive rights of McBryde; it had taken away all claims to surplus waters; it had taken away the rights of all of the plaintiffs to divert waters out of the watersheds. What was left for remand?

Moreover, as evidenced by Chief Justice Richardson's opinion in *Reppun v. Board of Water Supply*, 65 Haw. 531, 656 P.2d 57 ("*Reppun*"), decided just nine days before *Robinson II*, the Court, in applying the law of *McBryde*, held that appurtenant water rights may be used only in connection with those particular parcels of land to which that right appertains,[28] and

> ... [T]he riparian water rights ... cannot be severed from the land in any fashion.[29] ... Appurtenant water rights are the rights to the use of the water utilized by parcels of land ... at the time of the Mahele ... In [*McBryde*] we said, "the use of the water acquired as appurtenant rights may only be used in connection with that particular parcel of

land to which that right is appurtenant," overruling "any contrary indication in our case law" ... *McBryde* "prevents the severance or transfer of appurtenant water rights".[30]

*Reppun* continued on to hold that when the plaintiffs attempted to reserve water rights to themselves when they transferred the land, those rights "were effectively extinguished by the attempted reservation of such rights."[31]

Thus, any small owner (or large) who had purchased water rights had them taken away by *McBryde*, and any water rights theretofore purchased by any of the plaintiffs (or any small owners) or condemned by the Board of Water Supply were taken away also. "No specific instruction was imparted to the trial court" because the issues passed upon by the trial court were totally destroyed by *McBryde*'s new law. There was nothing unfinished for that court to decide.

The Richardson Court followed up that verbal ploy by first stating that "Since its [appellate] reversal provided no instructions to the contrary, the *McBryde* judgment after appeal was only a partial quantification of the parties' appurtenant water rights. No other final determination with res judicata effect remained." As stated above, there was nothing left to any of the plaintiffs' claims to water, save the quantification of the amount per acre of appurtenant riparian rights. The quantification per acre had already been made in the trial court. There was nothing left for that court to do. The State had all the water, subject only to riparian rights. As to the statement, "This Court did not utilize its power to render a final judgment," the Richardson Court quickly continued, "This ... is not to say that the determination of rights rendered in the court's judgment was without effect. Upon continuation of the case at the trial level, such determination would constitute the law of the

---

27. *Gay II, supra.*

28. *Reppun, supra,* 65 Haw. p. 538, 656 P.2d 57.

29. *Reppun,* p. 550, 656 P.2d 57.

30. *Reppun,* p. 552, 656 P.2d 57.

31. *Reppun, id.*

case." [32]   Again endeavoring to avoid the matter of finality, the Court said, "*McBryde* necessarily left unresolved factual and legal issues that would require a determination by a trial court prior to any final judgment respecting the distribution of the waters of the Hanapepe." The only factual and legal issues "necessarily left unresolved" were (1) identification of riparian lands, and (2) "most significantly the nature and scope of any remedies to be afforded the parties."

The identification of the riparian lands [1] was never an issue or problem in *McBryde* because, as the court stated in *Reppun,*

> [T]he Mahele and subsequent Land Commission Award and issuance of royal Patent right to water was not intended to be, could not be, and was not transferred to the awardee, and the ownership of water in natural watercourses, streams and rivers remained in the people of Hawaii for their common good.

54 Haw. at 186–87, 504 P.2d at 1339. An expression of the will of the sovereign with respect to waters is next found in section 7 of the Enactment of further Principles, Laws of 1850, p. 202. This section provided in relevant part that:

> The people also shall have the right to drinking water, and running water and the right of way. The springs of water and running water, and roads shall be free to all, should they need them, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water courses which individuals have made for their own use.

In *McBryde* meaning was given to this language *for the first time* when we ruled that the statute, at the time of its passage, imposed the "natural flow" doctrine of riparianism upon the waters of the Kingdom.   We continue to find this interpretation to be appropriate and proper.[33]

Every plaintiff was fully aware of the lands it owned along the river.   Neither the State nor any plaintiff contested the ownership of lands.   The only basic problem, as heretofore stated, before the trial court was quantification.   That's all the trial court did, based upon the then-existing law.

As to the "nature and scope of any remedies to be afforded the parties" [2], the Richardson Court did not suggest even one possible remedy.   Actually, the nature and scope of the only remedy sought by the plaintiffs after the Richardson Court had radically changed the existing water rights laws was to seek compensation for the unconstitutional taking of their established rights.   There was an attempt on the part *of all of the plaintiffs* (as stated above, neither Olokele nor the small owners had first appealed) in *McBryde II* to raise the constitutional issue of unlawful taking. This attempt was summarily rejected by the Court; the Court would not permit any argument on that issue at all.

It must be stated again: there was nothing left for the plaintiffs to take back to any state trial court.   Any such action was foreclosed by *McBryde* itself as the law of the case, thus automatically invoking on behalf of the State the rule of collateral estoppel or bar and merger in any action by the State to quiet title to the waters of the Hanapepe, or enjoin its diversion, or any attempt by any plaintiff to restore its old rights.   Due to the finality of *McBryde II,* their only source of relief, therefore, was in the federal courts.

---

**32.** *Robinson II,* 65 Haw. p. 652, 658 P.2d 287.

**33.** *Reppun,* 65 Haw. at 544–45, 656 P.2d 57.

3. Do the rulings in *McBryde*, with respect to water ownership and water diversion have binding precedential effect on the Hawaii state courts?

The answer is "yes". The rulings in *McBryde I* with respect to water ownership and water diversion have binding precedential effect on Hawaii state courts, even to the extent that *McBryde I* contains "technical" dicta.

---

### This Court's Analysis:

The court's opinion in *Reppun, supra,* also answered this with a resounding "yes"!

4. Does *Territory v. Gay*, 31 Haw. 376 (1930) (*Gay II*), aff'd 52 F.2d 356 (9th Cir.), cert. denied 284 U.S. 677 [52 S.Ct. 131, 76 L.Ed.2d 572] (1931), preclude the State of Hawaii from bringing an action against Robinson, Olokele, McBryde, or the Small Owners to enjoin them from diverting water from the Koula or Hanapepe watershed?

The answer is "no", because *Gay II* was not an attempt on the part of the State "to enjoin a wrongful diversion of water out of the Manuahi, Koula, Hanapepe watershed" by G&R. The non-parties to the earlier litigation, *Territory v. Gay*, could not argue claim preclusion. Even the parties to the earlier action could not argue claim preclusion because the issues and claims in the earlier action were (indefinably) different.

---

### This Court's Analysis:

This simplistic analysis completely bypasses the fact that the court of appeals affirmed the decision of the Territorial Supreme Court in *Gay II*, and *Gay II* held that the konohiki is the owner of the normal surplus water of an independent ili "to do with as he pleases." [34] The rights of the konohiki to divert the water out of the watershed were thoroughly analyzed, explored, and passed upon by Chief Justice Perry, in *Gay II*. The "Answer" tries to evade and avoid the "res judicata" effect of *Gay II*.

5. Does *McBryde, supra,* preclude any or all of the appellees from bringing an action in state court alleging that their property was taken without compensation in violation of the Fifth Amendment to the United States Constitution?

The answer is "yes"! No suit for damages is permissible, because there is no enabling statute. The private parties are not entitled to a Fifth Amendment action. The availability of the "rehearings process" and "of review by the United States Supreme Court" provided "adequate opportunity to prevail on the merits when justified . . . . We perceive no reason to provide [the parties] with two complete bites of the apple." Any motion for relief from judgment is not available.

---

### This Court's Analysis:

That is what this court and the court of appeals said in *Robinson I* and *III* because the judgment in *McBryde II* was *final*, and plaintiffs had been denied any hearing on violation of their constitutional rights.

The Richardson Court's discussion of the takings issue sharply illustrates the obfuscation and evasiveness of the Answers of

---

**34.** Syllabus, *Gay II*, 31 Haw. 376, 377.

that Court. As set forth above, when that Court turned the law of waters in Hawaii upside down by superimposing the common law doctrine of riparian rights upon the prior settled Hawaiian law, declared that the State owned all waters, took away all claims of prescriptive rights, and declared that neither McBryde nor G & R could divert water out of the Hanapepe watershed, neither the small owners nor Olokele had joined in the appeal. The Court's decision was not within the issues raised and tried in the circuit court, nor within the question presented by the appeal and argued to the Court. Perforce, Olokele and the small owners were forced into the appellate procedure to save their own interests from the totally unexpected ukase of what became the three-judge majority. All plaintiffs maintained that the Court's action had violated the petitioners' rights under the state and federal constitution, including the takings clause of the Fifth Amendment. As the uncontradicted affidavits of all plaintiffs' attorneys filed in *Robinson I* show, the Court refused to consider the plaintiffs' briefs on the constitutional issue, limited the questions to the interpretation of H.R.S. § 7-1 and the transfer of

appurtenant water rights, and, at time of argument, cut off and shut off each and every attempt on the part of plaintiffs' attorneys to argue the constitutional problems. The plaintiffs were given no chance to bite the apple in *McBryde I* or *II*.

When one reads the Court's interpretation of what occurred, as presented in *Robinson II*, 65 Haw. pp. 659–662, nn. 14–18, 658 P.2d 287, the Court saying: "Argument was heard pursuant to the petition, the court considered the argument presented, the minutes of the court clerk reflect the taking issue was discussed," and concluded, "We agree with the state that this opportunity to present arguments and to potentially prevail in the foregoing judicial proceedings were sufficient to insure appellees [plaintiffs herein] their day in court," one can only conclude that the above statements were deliberately and grossly misleading (and, if presented in the federal courts, would *mandate* F.R.Civ.P. Rule 11 sanctions). It was only in this federal court that the plaintiffs had a full and uncircumscribed opportunity to raise the constitutional questions.

6. Until *McBryde, supra,* was decided, had the issue of who owned surplus water been a settled question in Hawaii law?

After stating "It is generally recognized that a simple privately owned model of property is conceptually incompatible with the actualities of natural watercourses. Rather, the variable and transient nature of the resource, as well as the necessity of preserving its purity and flow for others who are entitled to its use and enjoyment have led to water rights being uniformly regarded as usufructory and correlative in nature," citing a 1972 "Model Water Code" and a 1957 Law Review article on government ownership and trusteeship of water. The court concluded: "A part of Hawaii's caselaw, however, appears to have departed from this model by treating 'surplus water' as the property of a private individual.[25] We do not believe the departure represented 'settled' law. Instead, as the following review of the relevant caselaw and its impact demonstrates, Hawaii's law regarding surplus water was at the time of *McBryde* in such a state of flux and confusion that it undoubtedly frustrated those who sought to understand and apply it. The difficulty of insuring an equitable distribution of unevenly flowing waters in the face of competing claims and in-

creasing demands made the delineation and application of a simplistic doctrine of ownership well nigh impossible. *McBryde* was brought to us for decision in this context." The court then continues to review those Hawaiian cases that in narrow selected excerpts gave any support, however slight, to its *McBryde I* opinion, ignoring the full impact and import of the decision.

---

### This Court's Analysis:

The Answer does not suggest why precise quantification of the division between normal surplus and storm and freshet surplus is essential to the existence of settled law concerning the ownership of surplus water. Nor does the answer explain away the Hawaii cases (all overruled en masse by *McBryde I*) that recognized and determined the ownership of surplus water without quantifying it.

The only area of uncertainty was that created by *Carter v. Territory*, 24 Haw. 47, which concerned only *storm* and freshet surplus. The law regarding normal surplus was solidly settled, as Justice Marumoto, Justice Levinson, this judge, and the judges of the Ninth Circuit Court of Appeals had heretofore clearly concluded in their respective opinions and decisions. Only the three justices in *McBryde I* could find anything unsettled with the law concerning normal surplus water,[35] and that was made possible only by lumping "normal surplus" with "storm and freshet" and referring to all as "surplus".

When one reviews the 30–printed-page response of the Richardson Court to the six questions, it becomes manifest that it was endeavoring, by misdirection, misinformation, misapplication, and misconstruction of facts and law to save its *McBryde* decisions and avoid the constitutional consequences

of its unprecedented radical and violent change in the law on waters in the State of Hawaii. Cutting like a strand of barbed wire in the fabric of the Richardson Court's artfully manufactured Answers is that Court's adamant refusal to modify any rule set forth in *McBryde*, viz., the State owns all the water, prescriptive rights to water cannot be acquired, only ripa owners have a right to use water (and only on riparian lands), appurtenant water rights may not be severed from the land, and water cannot be diverted out of its watershed. Although the Court verbalized that its decision was not final, it did not, and could not, specify any area in which any state court would be able to change the above rules. The Richardson Court, recognizing that since its opinion did not respond to the issues raised and tried in the trial court its major statements on the law might be deemed dicta, nevertheless clearly stated that even if its opinion were construed as dicta, the lesser courts would be bound to follow that dicta!

If *McBryde I* and *II* state the law, then, under the newly declared application of the commonlaw doctrine of riparian rights to the waters of Hanapepe, the owner of any riparian land downstream from any of the plaintiffs, even if only to see the water go by his land to the sea, would have *McBryde's* unequivocal blanket holdings as a legal cudgel to stop any diversion of

---

**35.** In the quotation from *Robinson II, supra,* is to be found note 25. That note typifies the frantic search on the part of the Richardson Court to justify its sudden reversal of settled law. Because the rights of the konohiki as to surplus water were first decided during the Monarchy and the Republic, and after 1897 by judges and justices of the Territorial Supreme Court appointed by the President of the United States, therefore, said the Answers, all those opinions "were not the product of local judi-ciary," therefore, "[w]e doubt whether those essentially federal courts could be said to have definitively established the commonlaw of what is now a state ... And it is from our authority as a *state* that our present common law springs." Pure chauvinistic sophistry! The Richardson Court would hold for naught the Constitution of the State of Hawaii, Article XVII, Section 9—"Continuity of Laws:" "... all existing ... judgment ... titles and rights shall continue unaffected...."

water outside the Hanapepe watershed as being a violation of his rights as a riparian landowner.

*Reppun* clearly and finally implemented *McBryde's* destruction of the value of the water rights owned by several of the small owners, as well as G & R and McBryde, who had purchased the same from owners of such appurtenant rights, when it held that "the riparian water rights ... cannot be severed from the land in any fashion. Their sole purpose [was] to provide water to make tenants' lands productive—no other incident of ownership attached." [36] *Reppun* so held even though the Board of Water Supply, a public body, had, by *condemnation*, as well as purchase of appurtenant water rights, secured by *deed*, title to certain appurtenant water rights involved in the case. The attempted conveyance of water rights to the Board was declared a nullity, and the Board of Water Supply secured no rights whatsoever. The *Reppun* court went further, holding: "While the trial court correctly ruled that the BWS could not have acquired the appurtenant water rights of the plaintiffs because of *McBryde*, it erred in holding that the plaintiffs' *land* retained such rights, inasmuch as they were effectively extinguished by the attempted reservation of such rights".[37] (Emphasis added.) Water "rights" no longer legally exist in Hawaii.

The action of the Richardson Court in *Reppun* removes all question of "finality" as to water rights which may have been purchased by any of the small owners, as well as G & R and McBryde. Before *McBryde*, owners of appurtenant water rights regularly severed appurtenant water rights and traded them for one acre of land, thus owning two acres of land—minus water rights. After *McBryde I* and *II* and *Reppun*, such marketability was completely destroyed. There can be no question of "ripeness" on this issue.

As discussed hereafter, there is no question but that the State can take, as well as regulate the use of, its waters and the lands of the State for the benefit of the public good. But when there is any taking of vested property rights by the State for such public good, the State must pay just compensation. That is Hornbook law. That is what the Supreme Court said in *Hughes*, supra, *Nevada*, supra, and *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631.

## CONCLUSION

■ As repeatedly and vehemently expressed above, after the court of appeals had received the verbose and evasive Answers, it was clear to that court that *McBryde I* and *II* constituted a final judgment, taking away property of the plaintiffs in violation of their constitutional rights.

The Solicitor General was misled by the self-serving and ambiguous misrepresentations and half truths of the Answers.

Contrary to the inferences drawn therefrom by the Solicitor General, (1) The water commissioner was not the head of a regulatory agency—he was the judge of the Fifth Circuit Court of Hawaii; (2) His decision of 1965 was not a "regulatory" one; it was a quantification of the amount of water, appurtenant and/or prescriptive, to which each party was entitled by virtue of rights admitted by all parties to have already vested; (3) Hawaii's law as to appurtenant water rights in the normal daily flow in the Hanapepe stream and konohiki prescriptive rights to the daily surplus water had long been and was then well settled. The rights of the konohiki to storm and freshet waters was the only area that might possibly have been held "unsettled"; (4) The common law doctrine of riparianism was not the law of Hawaii; (5) The law was well settled that water could be diverted out of the watershed; (6) The law was well settled that konohiki, appurtenant, and prescriptive water rights could be bought, sold, and transferred—separately and apart from the land underlying those rights. Water rights were "property"; (7) The State did not own, even in the public trust sense, *all* fresh waters; and (8) The Richardson

---

36. *Reppun*, 65 Haw. p. 550, 656 P.2d 57.

37. *Reppun*, 65 Haw. p. 552, 656 P.2d 57.

Court's Answer # 3, viz., "The rulings in *McBryde* with respect to water ownership and water diversion have a binding effect in the state courts of Hawaii," and part 2 of question # 5 precludes any independent action in Hawaii's courts by the plaintiffs to secure relief from the *McBryde* judgment, as well as any original actions relating to plaintiffs' use of the waters of the Hanapepe.

This court can find no light, not even the lumen of a firefly's feeble flicker, emanating from *Williamson County* which can be applied to the facts of this case. It is hoped that the Supreme Court now will have time to review the State's petition for certiorari in greater detail. This judge respectfully submits that after such review, The Court should dismiss the writ of certiorari as improvidentially granted.

The judgment of this court in *Robinson I*, as amended by the Court of Appeals in *Robinson III*, is REAFFIRMED.

## HAWAII WATER CODE

One new issue has been raised by the State. Section 7 of Hawaii's 1978 Constitutional Convention mandated the State "to protect, control, and regulate the use of Hawaii's water resources for the benefit of its people," and required that:

> [t]he legislature shall provide for a water resources agency which, as provided by law, shall set overall water conservation, quality and use policies; define beneficial and reasonable uses; protect ground and surface water resources, watersheds, and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawaii's water resources.

It was not until May 29, 1987, that the State Legislature enacted the Hawaii Water Code (Chapter 45, Section 1, Haw.Sess. L.).[38] On June 2, 1987, therefore, the State filed its brief requesting this court to deny the federal relief sought by the plaintiffs or, if appropriate, to abstain under *Pullman*,[39] certify all material questions of the state law to the Supreme Court of Hawaii under Rule 13, Haw.R.App.P. 1986, and dismiss the case.

The State's position[40] is that "the Water Code ends this case" because it sets forth a plethora of proceedings and decisions that "will create a completely new statutory basis for protecting and identifying private interests in the use of water ... Every interest the private landowners might have in the use of water that is plausibly protected by the Constitution against uncompensated taking will be subject to protection in that process."

The State maintains that "the litigation in the Fifth Circuit Court on Kauai ... is still ongoing,"[41] and "in the ongoing State case plaintiffs have a substantial chance to come out the winners in that long battle [through the implementation of the Water Code]."[42] That statement may well deserve the imposition of sanctions upon the State under F.R.Civ.P. Rule 11. The statement is grossly misleading and the intent underlying it, suspect. At the very end of the final Amended Judgment[43] determining all of the rights of the parties before him, the trial judge retained jurisdiction to enforce the Judgment of that court, enabling any parties to return to the court for enforcement purposes only. No party has "returned" since *McBryde*. Nothing was remanded to it by *McBryde*. No Complaint or Motion, nothing has ever been filed on or under that Amended Judgment. The record shows positively that there is nothing "ongoing" in the *McBryde* litigation in the Fifth Circuit Court.

If this court were to follow the State's request and dismiss this case, then under

---

**38.** See Exhibit 1 attached to State's Brief of June 2, 1987 on this subject.

**39.** *Railroad Comm'n. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**40.** State's Brief, p. 1.

**41.** *Id.,* p. 2.

**42.** *Id.,* p. 3.

**43.** Filed in Case # 4879 (*McBryde I*) in the Kauai trial court.

the law of the State of Hawaii, as set forth in *McBryde* and *Reppun*, the State would *own* all the water. No longer would any of the plaintiffs have any vested *right* in any water of the Hanapepe River, be it appurtenant, normal daily surplus, or prescriptive. The Water Code did not *reverse McBryde, Reppun,* and *Robinson II* on that issue.[44] As discussed above, *McBryde* held that while *Gay II* (holding that G & R was the owner of the daily surplus water), was res judicata, nevertheless, under *McBryde*'s newly adopted commonlaw doctrine of riparianism there was no such thing as surplus water, ergo, *Gay II* was res judicata as to nothing!

*McBryde I* also stated, "McBryde has no prescriptive right to water ... no one may claim title against property owned by the State."

Also, to repeat: In *Reppun*, the Richardson Court stated, "In *McBryde v. Robinson, supra,* we ruled that the appurtenant nature of these [appurtenant water] rights precluded the transfer of such waters ..." and that "water acquired as appurtenant rights may only be used in connection with that particular parcel of land to which that water is appurtenant...." The *McBryde* rule "prevents the severance or transfer of appurtenant water rights...."[45] *Reppun* went on to hold that the Board of Water Supply did *not* acquire the appurtenant water rights it had purchased or condemned, and further held that such transfer extinguished the water rights; that neither riparian water rights nor appurtenant water rights can "be severed from the land in any fashion." If the land were sold, the water rights, whether riparian or appurtenant thereto, could not be reserved to the grantor by deed. "They were not the grantor's to reserve." The rights were permanently extinguished; the grantor could not reserve the water rights if he sold the land; and the grantee of the water rights received nothing.[46]

Although Section 63 provides that "appurtenant rights are preserved," the Advisory Commission stated, "The evaluation of a taking will have to be judged on a case-by-case basis," and the best that the Commission could state was that "substantial protection *may* be accorded common law water rights under the 1987 Constitutional Amendment."[47] (Emphasis added.)

If *McBryde* remains the law, there were and are no *commonlaw* riparian or appurtenant water rights to "preserve" or "protect". *McBryde* stated they were all creatures of H.R.S. section 7-1, so the State owned the water, as referred to many times heretofore.[48] The Commission recognized that under *McBryde*, if it denied a permit on the ground that the applicant's proposed use did not confirm with the goals of the State water plan, then "no taking *should* be found" (emphasis added).[49]

As to inchoate konohiki rights, the Commission said *McBryde I* "essentially held that konohiki *rights* or *rights to surplus waters do not exist.* If the Ninth Circuit does not 'reverse' [*McBryde*] ... the konohiki rights do not exist. If the Ninth Circuit reinstates the concept of the konohiki rights" (emphasis added), then there are two possible interpretations of the nature of those rights. The first is to return to the pre-*McBryde* definition of such rights as rights to a fixed amount of water. The second approach would be to follow the definition of konohiki rights, as set forth in *Robinson II,* where "the Hawaii Supreme Court ... redefined konohiki rights and held them to be reciprocal in nature."

"If the 1982 [*Robinson II*] Answers prevail, konohiki rights will *not be* considered rights to fixed quantities of water. This characterization has important consequences in the takings analysis since ko-

---

**44.** Section 49(c) did reverse *McBryde* by allowing the Water Commission to allow the holder of a use permit to divert ground water outside the watershed.

**45.** *Reppun,* 65 Haw. at 552–53, 656 P.2d 57.

**46.** *Reppun,* pp. 551–53, 656 P.2d 57.

**47.** Advisory Commission Report, p. 35.

**48.** *Reppun,* 65 Haw. at pp. 549–552, 656 P.2d 57.

**49.** Advisory Commission Report, p. 33.

nohiki rights based on a reciprocal use presents a weaker grounds for taking [underscoring added]."

*Vested rights* are not protected in the Code. In that respect, such portions of the Code may be violative of the State Constitution on its face because Article XI, Section 7 of the constitution, supra, mandates that the Code shall "establish criteria for water use priorities while *assuring* appurtenant rights and *existing correlative* and riparian *uses* [emphasis added]." This problem was recognized in the report of the Advisory Study Commission on Water Resources to the 13th Legislature, State of Hawaii, January 14, 1985:

> Two important issues are raised by the language of the amendment. The first is whether all existing riparian and correlative uses should be "grandfathered", or preserved intact regardless of the requirements of the recommended code. The second issue is whether all appurtenant claims to water rights, whether or not present use is being made, need to be guaranteed.

The report then continues to assure the Legislature that in the opinion of the Advisory group there was no grandfathering, but that all appurtenant rights are protected!

As was recognized by the Commission, the second constitutional question under the recommended water code is whether or not it may terminate unexercised <u>rights</u> to water. This problem would affect any of the small owners who were not, on July 1, actually using the water to which the Kauai Circuit Court found that they were entitled. The Commission then analyzed the four approaches, viz., (1) under *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) holding that there is a taking where the regulation causes a substantial decrease in the value of the property; (2) under *Southwest Engineering Co. v. Ernst*, 79 Ariz. 403, 291 P.2d 764 (1955), holding that choices must be made between competing property interests; (3) under *Village of Tequesta v. Jupi-*

*ter Inlet Corporation*, 371 So.2d 663 (Fla. 1979), likening water regulation to land use regulation; and (4) under California cases holding that when the California Water Code attempted to terminate inchoate rights such termination was held unconstitutional. (The Advisory Commission felt that *Pennsylvania Coal* had repudiated that position.) After such review, the best that the Commission could say regarding the constitutionality was that "the legal tests <u>strongly favor</u> the State's power to constitutionally regulate water without the need for compensation."[50] (Underscoring added.)

The Commission further felt that the termination of inchoate riparian or correlative rights would not constitute a taking, and concludes that the denial of a permit based upon riparian or correlative rights would never amount to a taking because "only wasteful, inefficient, or non-conforming uses will be denied in the permitting process."[51] NOTE: Would that this court had such a crystal ball!

As the above Commission's analysis itself indicates, if *McBryde, Robinson II*, and *Reppun* remain the law on water rights, the small owners, who owned both the land and the water rights attached thereto and have not used those rights, certainly have no protection under the Code. The only protection which the small owners, who bought water rights or who are presently using water rights, is the hope that the Commission may not deny them their present use of the water. While it is assumed that the Commission will act in good faith, if, for any reason, those small owners at any time in the future, for the benefit of the general public, should be denied water, under *McBryde* there would be no "taking". They could never be compensated for the loss of water which McBryde said was not theirs.

The same statements apply to all the plaintiffs, because under *McBryde* and *Reppun*, they have no vested RIGHTS of any sort to any water. It has already been taken from them and given to the State.

---

**50.** Advisory Commission Report, p. 33.

**51.** *Id.*, p. 34.

Even though any of them may apply for continued use of the present quantity of water being taken, there is nothing in the Code to guarantee that they would be granted that or any amount. Although the Code empowers the Commission to allow water to be taken out of the watershed (contra *McBryde*), if, at any time, the Commission should feel that such water should be used to a better advantage for other purposes, then no matter what expenditures any of the plaintiffs had made in the years past in developing dams, ditches, pipelines, sugar mills, farms, and plantations, all of which would be lost if they could not take the waters, none of the plaintiffs would be entitled to any compensation from the State because of such denial of their water rights. The "taking" *without compensation* would be perfectly legal—if *McBryde, Robinson II,* and *Reppun* remain the law on waters in Hawaii.

The Water Code mooted nothing. Either the plaintiffs go before the Commission with their requests for permits carrying the *vested* and *legally protected water rights* they held before *McBryde*, with full knowledge that by virtue of those vested rights they can still maintain the value of their lands and all of the buildings and improvements thereon, or they go before the Commission naked—stripped of any rights whatsoever—as supplicants begging for water, unable to spend any money in developing their lands because they might not get it, or, if they got it, knowing that all could be taken away without any compensation. The passage of the Hawaii State Water Code, Act 45 of the Fourteenth Legislature, First Session, does *not* provide the plaintiffs with any adequate assurance of the protection of their rights under the Fifth and Fourteenth Amendments.

Of course, no one knows the full impact of the Water Code upon waters of Hawaii. The Commission's report itself shows that the Commission felt that the Legislature had not substantially renounced the conclusions of the Richardson Court. The Water Code not only does not address, but specifically disavows any intention to address, the issue of ownership of water and the rights

thereto, which were the subjects, sua sponte, raised and decided by the *McBryde* Court, and which are now the subject of the litigation in this federal court. It would be grossly unjust to throw aside 60 years of litigation, with, most recently, 11 years thereof in the federal court, and require the plaintiffs to attempt to eradicate the effects of *McBryde* through years of administrative proceedings under the Water Code—with no assurance that they would ever be granted the just relief from the straitjacket of *McBryde, Robinson II,* and *Reppun* that they deserve, and deserve now.

The State's Motion to Dismiss is DENIED.

IT IS SO ORDERED.